*Decision will be entered under Rule 50.*

THOMAS KERR AND BARBARA KERR, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 89256. Filed August 27, 1962.

*John P. Apicella, Esq.*, and *Guy J. Rappleyea, Esq.*, for the petitioners.

*John D. Picco, Esq.*, for the respondent.

FAY, *Judge:* Respondent has determined a deficiency in the income tax of petitioners for the year 1955 in the amount of $26,036.45. The basic issue presented for decision is whether the amount received by petitioners from a corporation whose outstanding capital stock was owned by petitioners, in exchange for 100 percent of the outstanding capital stock of another corporation owned by petitioners, is taxable as a distribution essentially equivalent to a dividend pursuant to the provisions of sections 302 and 304 of the Internal Revenue Code of 1954.[1]

If the answer to this question is in the affirmative, the petitioners contend that sections 302 and 304 of the Code are unconstitutional in

---

[1] Unless otherwise indicated, all Code references are to the I.R C. 1954.

that they cause the imposition of a direct property tax not apportioned among the several States as required by article I of the Constitution of the United States.

FINDINGS OF FACT.

Some of the facts are stipulated and are incorporated herein by this reference.

The petitioners are Thomas Kerr and Barbara Kerr, husband and wife. Their residence was in Portland, Oregon, and they filed a joint income tax return with the district director of internal revenue at Portland, Oregon, for the year 1955. (For convenience, Thomas Kerr will hereinafter be referred to as the petitioner.)

Petitioner's family has been engaged in the grain and milling business in Portland and the Pacific Northwest area since before the turn of the century. The petitioner entered the employ of the family grain business, known in later years as Kerr Gifford and Co., Inc., upon his graduation from college in 1932, and he has been engaged in the grain business and related activities continually since that date to the present. Kerr Gifford & Co., Inc., was acquired by Cargill, Incorporated, in June 1953, and petitioner thereafter entered the employ of the latter corporation as an executive.

In 1947 petitioner organized the Helix Milling Company, an Oregon corporation (hereinafter referred to as Helix), for the purpose of engaging in the business of milling and selling flour. The outstanding stock of Helix, consisting of 100 shares, $100-par-value stock, was issued to petitioner in exchange for the mill property. Since Helix's incorporation, petitioner has been its president, its chief executive officer, and a director.

Helix, after its incorporation, was operated by Kerr Gifford and Co., Inc., and later by Cargill, Incorporated, under an arrangement whereby the latter corporations handled the financing of Helix's operations in return for a share of its profits. Helix produced flour almost exclusively for overseas markets in the Far East. In early 1954 in an effort to improve and stabilize its income and to expand its operations, Helix commenced construction of a modern grain elevator as an adjunct to its flour mill. To finance this facility Helix borrowed $200,000 from the United States National Bank of Portland (hereinafter referred to as the Portland bank) on a 10-year-term loan secured by a first mortgage on the grain elevator. The petitioner gave his personal guaranty to the bank as additional security for the construction loan. The grain elevator was completed sometime around the end of 1954.

During this same period Cargill, Incorporated, pursuant to its arrangement with Helix, advanced substantial sums to Helix for working capital and for use in connection with the construction of the grain elevator.

Helix made a net profit before income tax deductions of $43,438.90 during its fiscal year ended June 30, 1954. The minutes of the special meeting of the directors of Helix held on June 29, 1954, provided, in part, as follows:

The Board of Directors expressed their unanimous approval of the company's past operations and of the policies of the management which have produced the present satisfactory condition of the company.

The minutes also noted that no officers' salaries had heretofore been fixed or paid because of the other financial requirements of the company. A resolution was then unanimously adopted whereby a salary of $9,000 was established for the petitioner for the fiscal year ended June 30, 1954, and was made payable in cash as of June 30, 1954.

In November 1954 petitioner had a meeting with representatives of Cargill, Incorporated, and was informed by them that his employment with Cargill was to be terminated within the next several months. However, nothing was said at the meeting regarding the status of the financing arrangement between Cargill and Helix.

As a result of this meeting, petitioner realized that he would have to seek other means of livelihood, since his salary from Cargill, Incorporated, was his principal source of income. Because the Northwest area was encountering a problem regarding the storage of Government surplus grains, or so petitioner believed, petitioner decided to go into the grain storage business. On January 19, 1955, petitioner organized the Kerr Grain Corporation for the purpose of engaging in the grain brokerage and grain storage business. In forming Kerr Grain, petitioner was hopeful that the corporation would be able to obtain business from the Federal Government. Petitioner was aware that, in the absence of such business, the corporation would experience difficulty. The outstanding stock of Kerr Grain consisted of 5,000 shares, $100-par-value stock, all of which was issued to petitioner at the time of organization for $50,000 in cash. The petitioner at all times pertinent to this proceeding has been president and chief executive officer of Kerr Grain.

Even though petitioner's employment with Cargill, Incorporated, was to be terminated, Cargill, Incorporated, was still interested in the operation of Helix and offered to make additional loans to Helix in return for certain sales and competitive concessions by petitioner. The offer by Cargill was made before its president learned that petitioner had organized the Kerr Grain Corporation. Upon learning of the formation of Kerr Grain, Cargill's president notified petitioner that unless petitioner halted his plans to go into the grain storage business the arrangement between Cargill and Helix would be terminated and Helix would have to repay its current indebtedness to Cargill.

Petitioner contacted the Portland bank and was able to secure loan commitments which would be sufficient to liquidate the Cargill indebtedness, which by this time totaled approximately $325,000. Petitioner then notified Cargill that he was going to pay off its loans. In order to obtain the necessary funds, petitioner executed personal notes to the Portland bank totaling $150,000 and pledged as security for said loans his expected inheritance from the estate of a deceased relative. After petitioner obtained the money from the Portland bank, he loaned the money to Helix and received Helix's demand promissory notes for $150,000. By March 1955 Helix had succeeded in paying off its indebtedness to Cargill.

Due to the fact that several months elapsed between the time Helix first purchased the wheat and the time it received the proceeds from the sale of its flour, Helix usually found itself in a tight working-capital position. Consequently, even after liquidating the Cargill loans, Helix found it necessary to borrow money for working-capital purposes, and since the agreement with Cargill was no longer in effect Helix had to turn to other sources, notably the Portland bank, for funds. The Portland bank permitted Helix to borrow up to $500,000 for operating purposes. However, since the Portland bank considered the business of Helix to be hazardous and from a financial statement point of view considered Helix to be a marginal credit risk, it required the personal guaranty of petitioner to the extent of $300,000 on all operating loans to Helix.

As of June 30, 1955, Helix had total assets of $704,499, total liabilities of $474,448, and earned surplus of $130,051. For its fiscal year ended June 30, 1955, Helix sustained a net loss of $12,198.89.

Kerr Grain commenced operations in January 1955 and derived the principal part of its income in 1955 from the grain storage business. It did not become active in the grain-merchandising business until 1956. As of June 30, 1955, the end of its first fiscal year, Kerr Grain had total assets of $266,148 and total liabilities of $218,034. For its first fiscal year, Kerr Grain sustained a net loss of $1,886.40.

Following its organization, Kerr Grain lacked sufficient working capital to finance its operations and was forced to seek outside financing. The Portland bank extended it a credit ceiling of $150,000, and as in the case of Helix and for the same reasons, required the personal guaranty of petitioner as security. Helix also advanced various sums to Kerr Grain and paid its office expenses until August 1955.

The grain storage business in the Northwestern United States turned out to be extremely competitive with practically every large grain firm taking part in the storage business. In addition, a below-average wheat crop in 1955, coupled with heavy export activity by the Federal Government, reduced the amount of wheat available for storage purposes. As a result of this hazardous business situation, the

board of directors of Kerr Grain resolved in August 1955 that the company would "conserve its assets and not undertake any new commitments of any kind without the approval of the Board."

On August 24, 1955, petitioner reported to the board of directors of Helix that, except for the mortgage indebtedness to the Portland bank, the company had paid off all its borrowings from the bank as of August 22, 1955, and that since then it had borrowed an additional $40,000 on short term for current purposes. Petitioner admitted that borrowing was considered to be inherently involved in the type of business in which Helix was engaged.

By the fall of 1955 Kerr Grain's business began to improve, and as of October 24, 1955, Kerr Grain had a net profit from operations of $113,393.38. At about this time, the Portland bank agreed to finance certain short-term commitments contemplated by Kerr Grain in excess of its original credit ceiling of $150,000. Although the financial position of Helix and Kerr Grain had improved, the Portland bank still required the personal guaranty of petitioner up to a specified amount on all operating loans made to both companies.

On October 24, 1955, following discussions with his attorneys, accountants, and representatives of the Portland bank, petitioner at a meeting of the board of directors of Helix submitted a proposal to the board providing for the sale by petitioner to Helix of petitioner's capital stock interest in Kerr Grain. The purchase price was to be $50,000. The board voted to accept petitioner's proposal. Following the acceptance of his offer by the board of directors, petitioner conveyed all of the outstanding stock of Kerr Grain to Helix and received, in return, the promissory note of Helix payable in installments of not less than $10,000 per year and bearing interest at the rate of 5 percent per annum on the unpaid balance. The note was secured by the pledge to petitioner of the capital stock of Kerr Grain.

Petitioner's basis for the Kerr Grain stock on October 24, 1955, was $50,000. The stock had a book value on that date in excess of $100,000 and a fair market value in excess of $50,000.

Helix had an earned surplus of approximately $130,000 as of June 30, 1955, and as of October 24, 1955, its earned surplus was in excess of $50,000.

At the board meeting of October 24, 1955, petitioner reported to the directors of Helix that the Portland bank had granted to Helix an open line of credit in the amount of $100,000 and a $50,000 additional line of secured credit. As of October 24, 1955, Helix owed the Portland bank $30,000 against the open line of credit.

The Portland bank did not request that petitioner transfer his Kerr Grain stock to Helix; they did not request that the two companies be consolidated; and they did not require petitioner to transfer the Kerr Grain stock to Helix as a condition precedent to future financing.

However, representatives of the Portland bank did inform petitioner during their earlier discussions that the contemplated stock transfer may have "certain advantages—both credit-wise and tax-wise." After the sale of the Kerr Grain stock to Helix, the Portland bank continued to require petitioner's personal guaranty on all operating loans it made to both Helix and Kerr Grain.

Following the sale of the Kerr Grain stock to Helix, no curtailment of either corporation's activity was undertaken. In fact, following the sale, Kerr Grain expanded its business quite materially while Helix maintained its business on a fairly even keel until 1957 when it, too, expanded its operations.

Neither Helix nor Kerr Grain declared or paid a dividend prior to December 14, 1955. On December 14, 1955, Kerr Grain declared and paid a dividend of $33,500 to Helix. On the same date Helix paid an identical amount to petitioner, charging it to an account designated as "Notes Payable to Thomas Kerr."

On June 27, 1956, the board of directors of Kerr Grain declared a cash dividend in the amount of $16,500 to be paid on or before June 30, 1956. On June 27, 1956, the board of directors of Helix passed resolutions providing for the payment of bonuses totaling $13,000 to several of the Helix employees. The bonuses were to be paid on or before June 30, 1956.

For the fiscal year ended June 30, 1956, Kerr Grain and Helix filed a consolidated income tax return.

On petitioner's income tax return for the year 1955 no statement or information was submitted with regard to the sale of petitioner's Kerr Grain stock to Helix. The Commissioner in his notice of deficiency for that year determined that the amount of $50,000 received by petitioner from Helix was taxable as dividend income.

OPINION.

This case presents the issue whether the amount of $50,000 received by petitioner in 1955 from Helix was taxable as dividend income, as determined by the respondent. The respondent maintains that the transfer of Kerr Grain stock to Helix by petitioner constituted a redemption under section 304(a)(1) [2] and that, consequently, the entire

---

[2] SEC. 304. REDEMPTION THROUGH USE OF RELATED CORPORATIONS.

  (a) TREATMENT OF CERTAIN STOCK PURCHASES.—

    (1) ACQUISITION BY RELATED CORPORATION (OTHER THAN SUBSIDIARY).—For purposes of sections 302 and 303, if—

      (A) one or more persons are in control of each of two corporations, and

      (B) in return for property, one of the corporations acquires stock in the other corporation from the person (or persons) so in control,

then (unless paragraph (2) applies) such property shall be treated as a distribution in redemption of the stock of the corporation acquiring such stock. In any such case, the stock so acquired shall be treated as having been transferred by the person from whom acquired, and as having been received by the corporation acquiring it, as a contribution to the capital of such corporation.

amount received by petitioner was taxable as a dividend pursuant to the rules of sections 301 and 302.[3]  Petitioner concedes that the transaction falls within the purview of section 304(a)(1) and admits that the specific requirements for qualifying the transaction for capital gains treatment under section 302(b)(2), (3), and (4) are not met. Petitioner contends, however, that the redemption is not essentially equivalent to a dividend within the meaning of section 302(b)(1).

It is recognized in the case law and in the regulations that the question whether a distribution is essentially equivalent to a dividend depends on the facts and circumstances of each case.  *Earle* v. *Woodlaw*, 245 F. 2d 119 (C.A. 9, 1957), certiorari denied 354 U.S. 942 (1957) ; *Standard Linen Service, Inc.*, 33 T.C. 1 (1959) ; sec. 1.302-2(b), Income Tax Regs.  Although the cases on this point have failed to lay down a sole decisive test, *Flanagan* v. *Commissioner*, 116 F. 2d 937, 939 (C.A.D.C. 1940), affirming a Memorandum Opinion of this Court, they have established certain judicial criteria which have proven useful in determining the net effect of the distribution which, in actuality, is the fundamental question.  *Flanagan* v. *Commissioner*, *supra; Genevra Heman*, 32 T.C. 479 (1959), affd. 283 F. 2d 227 (C.A. 8, 1960) ; *Ferro* v. *Commissioner*, 242 F. 2d 838 (C.A. 3, 1957), affirming a Memorandum Opinion of this Court; and *John A. Decker*, 32 T.C. 326, 330 (1959), affirmed per curiam 286 F. 2d 427 (C.A. 6, 1960).

[3] SEC. 301. DISTRIBUTIONS OF PROPERTY.

(a) IN GENERAL.—Except as otherwise provided in this chapter, a distribution of property (as defined in section 317(a)) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c).

\* \* \* \* \* \* \*

(c) AMOUNT TAXABLE.—In the case of a distribution to which subsection (a) applies—

(1) AMOUNT CONSTITUTING DIVIDEND.—That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income.

\* \* \* \* \* \* \*

SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK.

(a) GENERAL RULE.—If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.

(b) REDEMPTIONS TREATED AS EXCHANGES.—

(1) REDEMPTIONS NOT EQUIVALENT TO DIVIDENDS.—Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend.

(2) SUBSTANTIALLY DISPROPORTIONATE REDEMPTION OF STOCK.— \* \* \*

(3) TERMINATION OF SHAREHOLDER'S INTEREST.— \* \* \*

(4) STOCK ISSUED BY RAILROAD CORPORATIONS IN CERTAIN REORGANIZATIONS.— \* \* \*

(5) APPLICATION OF PARAGRAPHS.—In determining whether a redemption meets the requirements of paragraph (1), the fact that such redemption fails to meet the requirements of paragraph (2), (3), or (4) shall not be taken into account. \* \* \*

(c) CONSTRUCTIVE OWNERSHIP OF STOCK.—

(1) IN GENERAL.—Except as provided in paragraph (2) of this subsection, section 318(a) shall apply in determining the ownership of stock for purposes of this section.

(2) \* \* \* [Not relevant to this case.]

(d) REDEMPTIONS TREATED AS DISTRIBUTIONS OF PROPERTY.—Except as otherwise provided in this subchapter, if a corporation redeems its stock (within the meaning of section 317(b)), and if subsection (a) of this section does not apply, such redemption shall be treated as a distribution of property to which section 301 applies.

Among these criteria are: Did the corporation adopt any plan of contraction of its business activities; did the transaction actually result in a contraction of the corporation business; did the initiative for the corporate distribution come from the corporation or the shareholders; was the proportionate ownership of stock by the shareholders changed; what were the amounts, frequency, and significance of dividends in the past; was there a sufficient accumulation of earned surplus to cover distribution or was it partly from capital; and was there a bona fide corporate business purpose for the distribution? *Flanagan* v. *Commissioner, supra; Earle* v. *Woodlaw, supra;* and *Genevra Heman, supra.* It is to be noted that while these criteria materialized for the most part in cases construing section 115(g) of the Internal Revenue Code of 1939, Congress has expressed a desire that they be made applicable to cases arising under section 302(b)(1) as well. S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., pp. 233, 234 (1954).

In applying these criteria to the facts in this case, we find ample evidence to support the respondent's determination that the net effect of the distribution to petitioner amounted to a taxable dividend. There was no manifestation by Helix or Kerr Grain of any policy or plan of contraction of their respective businesses; on the contrary, Kerr Grain expanded its activities quite materially after the sale and Helix maintained its business on an even keel until 1957 when it, too, expanded its operations.[4] The initiative for the stock transaction came from petitioner.[5] At the time of the transaction, Helix had accumulated earnings and profits available for the payment of dividends.[6] Prior to the stock transaction Helix had never paid a cash dividend.[7]

In *Ferro* v. *Commissioner, supra,* the court stated:

The declaration of a true dividend leaves the ownership and control of a corporation unaffected. Where a distribution of corporate assets likewise leaves proportionate interests unchanged, that circumstance has been termed "the most significant factor in finding dividend equivalence."

In the instant case, prior to the stock transfer petitioner owned all the outstanding stock of Helix and all the outstanding stock of

[4] *Ferro* v. *Commissioner,* 242 F. 2d 838 (C.A. 3, 1957), affirming a Memorandum Opinion of this Court; *Smith* v. *United States,* 121 F. 2d 692 (C.A. 3, 1941); *Thomas G. Lewis,* 35 T.C. 71 (1960).

[5] *Bazley* v. *Commissioner,* 155 F. 2d 237 (C.A. 3, 1946), affirming 4 T.C. 897 (1945), affd. 331 U.S. 737 (1947); *James. F. Boyle,* 14 T.C. 1382 (1950), affd. 187 F. 2d 557 (C.A. 3, 1951), certiorari denied 342 U.S. 817 (1951); *Pacific Vegetable Oil Corp.* v. *Commissioner,* 251 F. 2d 682 (C.A. 9, 1957), reversing 26 T.C. 1 (1956); *Commissioner* v. *Roberts,* 203 F. 2d 304 (C.A. 4, 1953), reversing 17 T.C. 1415 (1952).

[6] *Rheinstrom* v. *Conner,* 125 F. 2d 790 (C.A. 6, 1942), affirming 33 F. Supp. 917 (D. Ohio 1940), certiorari denied 317 U.S. 654 (1942); *Earle* v. *Woodlaw,* 245 F. 2d 119 (C.A. 9, 1957), certiorari denied 354 U.S. 942 (1957); *Genevra Heman,* 32 T.C. 479 (1959), affd. 283 F. 2d 227 (C.A. 8, 1960); *Flanagan* v. *Commissioner,* 116 F. 2d 937 (C.A.D.C. 1940), affirming a Memorandum Opinion of this Court.

[7] *James F. Boyle, supra; Flanagan* v. *Commissioner, supra; Thomas G. Lewis, supra.*

Kerr Grain. Applying the constructive stockownership rules of section 318(a)(2)(C),[8] petitioner continued to own 100 percent of the outstanding stock of both corporations following the stock transaction.

Petitioner contends, however, that the instant transaction "was undertaken to achieve a material and substantial corporate business purpose." It is petitioner's position that the creation of a parent-subsidiary relationship between Helix and Kerr Grain strengthened the credit position of the two corporations, facilitated the free flow of cash between the corporations, and enabled the corporations to conserve cash through the medium of filing consolidated returns.

With the exception of the consolidated returns item, we do not believe the record in this case permits the finding of a bona fide business purpose in the stock transfer. A representative of the Portland bank testified that Helix was permitted to borrow up to $500,000 for operating purposes; that, in addition, the bank had advanced $200,000 to Helix for the construction of a grain elevator; and that the bank had not requested the stock transfer as a condition precedent to future financing. Furthermore, petitioner offered no evidence that Helix or Kerr Grain were, in fact, unable to obtain adequate financing for their operations from the Portland bank prior to the stock transfer. While the acquisition of Kerr Grain stock may have to some degree ultimately resulted in a strengthening of the credit position of Helix, we have not been persuaded that this was a motivating force for the transfer. Our lack of belief in petitioner's contention becomes even stronger when we observe that after the sale of stock to Helix the Portland bank still required petitioner's personal guaranty on its loans to both companies.

Lastly, aside from his bare assertion, the petitioner has not shown how under the circumstances of this case the transfer of Kerr Grain

---

[8] SEC. 318. CONSTRUCTIVE OWNERSHIP OF STOCK.

(a) GENERAL RULE.—For purpose of those provisions of this subchapter to which the rules contained in this section are expressly made applicable—

\*      \*      \*      \*      \*      \*      \*

(2) PARTNERSHIPS, ESTATES, TRUSTS, AND CORPORATIONS.—

\*      \*      \*      \*      \*      \*      \*

(C) CORPORATIONS.—If 50 percent or more in value of the stock in a corporation is owned, directly or indirectly, by or for any person, then—

(i) such person shall be considered as owning the stock owned, directly or indirectly, by or for that corporation, in that proportion which the value of the stock which such person so owns bears to the value of all the stock in such corporation; and

(ii) such corporation shall be considered as owning the stock owned, directly or indirectly, by or for that person.

\*      \*      \*      \*      \*      \*

(4) CONSTRUCTIVE OWNERSHIP AS ACTUAL OWNERSHIP.—

(A) IN GENERAL.—Except as provided in subparagraph (B), stock constructively owned by a person by reason of the application of paragraph (1), (2), or (3) shall. for purposes of applying paragraph (1), (2), or (3), be treated as actually owned by such person.

stock to Helix facilitated the free flow of cash between the two corporations.

Petitioner contends and this Court recognizes that the filing of consolidated returns by affiliated corporations often permits certain tax savings. For this reason, we are of the opinion that there may have been a minimal bona fide business purpose in the stock transfer.[9]

However, the mere existence of a single bona fide business purpose will not of itself conclusively determine that the transaction does not result in the essential equivalent to a taxable dividend. *United States* v. *Fewell*, 255 F. 2d 496 (C.A. 5, 1958); *Bradbury* v. *Commissioner*, 298 F. 2d 111 (C.A. 1, 1962), affirming a Memorandum Opinion of this Court; *Kessner* v. *Commissioner*, 248 F. 2d 943 (C.A. 3, 1957), affirming per curiam 26 T.C. 1046 (1956); *Genevra Heman, supra; Neff* v. *United States*, 305 F. 2d 455 (Ct. Cl. 1962). Under the "net effect" test all factors are to be considered. *Fred B. Snite*, 10 T.C. 523 (1948), affd. 177 F. 2d 819 (C.A. 7, 1949). After considering all the factors in this case, it is the opinion of this Court that the practical effect of the stock transfer was the same as if Helix had declared and paid a dividend to petitioner.

Petitioner's argument that sections 302 and 304 are unconstitutional is predicated upon the contention that the application of these sections under the circumstances of the instant case would result in the taxation of capital rather than income and as such would be repugnant to article I, section 9, of the Constitution.[10] It is true that a return of capital is not income and may not be taxed as such, *Southern Pacific Co.* v. *Lowe*, 247 U.S. 330 (1918), but it is equally true that in determining whether a receipt represents income or the return of capital, the nomenclature used by the parties to the transaction is not necessarily controlling. *Commissioner* v. *Meyer*, 139 F. 2d 256 (C.A. 6, 1943), affirming a Memorandum Opinion of this Court. In the instant case we have determined that the distribution to petitioner by Helix was not a return of his capital investment, but was the equivalent of a dividend paid out of accumulated earnings and profits of Helix. The taxation of such a distribution does not violate article I, section 9, of the Constitution.

*Decision will be entered for the respondent.*

---

[9] The petitioner offered no evidence as to the amount or significance of the savings that the corporations purportedly hoped to obtain from the filing of consolidated returns. Consequently, this Court can only speculate as to the relative materiality of this advantage and in so doing we tend to bear most heavily against petitioner since he carries the burden of proof.

[10] Art. I, sec. 9.

No Capitation, or other direct, Tax shall be laid, unless in Proportion to the Census or Enumeration herein before directed to be taken.