Thomas KERR and Barbara Kerr, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 18371.

United States Court of Appeals Ninth Circuit.

Jan. 3, 1964.

Black & Apicella, John P. Apicella and Guy J. Rappleyea, Portland, Or., for petitioners.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Melva M. Graney, Ralph A. Muoio, and Meyer Rothwacks, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before CHAMBERS and BARNES, Circuit Judges, and BEEKS, District Judge.

BARNES, Circuit Judge:

This is a petition for review of a decision of the Tax Court in favor of the Commissioner. 38 T.C. 723. The Tax Court had jurisdiction of the cause under Section 6213.[1] This court has jurisdiction of this petition pursuant to Section 7482.

The taxpayer, Thomas Kerr,[2] owned all of the stock of two corporations. On October 24, 1955, he transferred the stock of one to the other for a note with face value of $50,000. There are two issues: (1) Was the $50,000 note taxable to him as a distribution essentially equivalent to a dividend under §§ 302, 304, and other related sections of the 1954 Code? (2) If we answer this question in the affirmative, are §§ 302 and 304 constitutional?

## I—FACTS

In 1947, taxpayer organized the Helix Milling Company (hereinafter "Helix") for the purpose of engaging in the business of milling and selling flour. All of

---

[1]. All references to sections are to the Internal Revenue Code of 1954 unless otherwise noted.

[2]. Barbara Kerr, the wife of Thomas, is involved in this suit only because they filed a joint return. Thomas is thus referred to here as the taxpayer.

the outstanding stock of Helix was acquired by taxpayer in exchange for the mill property, and taxpayer has been the corporation's president, chief executive officer, and a director, since the date of incorporation.

After its incorporation and until early 1955, Helix was operated by succeeding unrelated corporations under an arrangement whereby the latter corporations handled the financing and operation of Helix in return for a share of the profits. In early 1954, in an effort to improve and stabilize its income and to expand its operations, Helix commenced construction of a modern grain elevator as an adjunct to its flour mill. To finance this facility, Helix borrowed $200,000 from the United States National Bank of Portland ("bank") on a ten-year loan secured by a first mortgage on the grain elevator. The taxpayer gave his personal guaranty as an additional security for the construction loan.

Toward the latter part of 1954 a corporation (Cargill, Incorporated) which had been operating and financing Helix stated that it planned to withdraw its support, and taxpayer made banking arrangements to secure funds to liquidate the debts which Helix owed the withdrawing corporation. In order to obtain loans from the bank, taxpayer executed personal notes totalling $150,000 and pledged as security for the loans his expected inheritance from the estate of a deceased relative. After taxpayer received the money from the bank, he loaned it to Helix in return for five percent demand promissory notes.

Due to the fact that several months elapsed between the time Helix first purchased the wheat and the time it received the proceeds from the sale of its flour, Helix usually found itself in a tight working-capital position. Thus, Helix found it necessary to borrow money from the bank for working-capital purposes. The bank considered Helix as a marginal credit risk, and required personal guaranties from the taxpayer for most of the loans.

In January, 1955, taxpayer was faced with the loss of his employment with Cargill, Inc., which had been operating and financing Helix, and he realized that he would have to seek other means of livelihood. Taxpayer then organized the Kerr Grain Corporation (hereinafter "Kerr Grain") for the purpose of engaging in the grain brokerage and grain storage business. All of the outstanding stock was acquired by taxpayer for $50,000 in cash, and at all times pertinent to this proceeding taxpayer has been the president and the chief executive officer of the company. In forming Kerr Grain, taxpayer was hopeful that the corporation would be able to obtain business from the Federal Government, and he was aware that in the absence of such business the corporation would experience difficulty.

Following its organization, Kerr Grain, lacking sufficient working capital to finance its operations, was forced to seek outside financing. The bank extended it a credit ceiling of $150,000, and as in case of Helix, and for the same reasons, the bank required the personal guaranty of the taxpayer as security. Helix also advanced various sums to Kerr Grain, and paid its office expenses until August 1955.

As of June 30, 1955, Helix had an earned surplus of $130,051. For the fiscal year ended June 30, 1955, Helix sustained a net *loss* of $12,198.89, and taxpayer alleges that Helix continued to sustain losses up to and including October of 1955.

Kerr Grain got off to a shaky start, and sustained a net loss of $1,886.40 for its first fiscal period which ended June 30, 1955 (the first six months of operation), but soon began to improve and as of October 1955, it had a net profit of $113,-393.38.

On October 24, 1955, following discussions with his attorneys, accountants, and with representatives of the bank, taxpayer submitted a proposal to the board of directors of Helix providing for the sale of his stock in Kerr Grain to Helix

for $50,000. The board voted to accept taxpayer's proposal. Following the acceptance, taxpayer conveyed all the outstanding stock of Kerr Grain to Helix and received, in return, a promissory note for $50,000 payable in installments of $10,000 per year and bearing interest at the rate of five per cent on the unpaid balance. The note was secured by a pledge to taxpayer of the Kerr Grain stock. Taxpayer's basis for the stock on October 24, 1955, was $50,000. *The stock had a book value on that date in excess of $100,000 and a fair market value in excess of $50,000.* Helix' earned surplus then was in excess of $50,000.

At the board meeting of October 24, 1955, taxpayer also informed the directors of Helix that the bank had granted Helix an open line of credit in the amount of $100,000 and a $50,000 additional line of secured credit. At no time did the bank request that taxpayer transfer his Kerr Grain stock to Helix or that the two companies be consolidated. Nor did the bank require the transfer as a condition precedent to future financing. However, representatives of the bank did agree with taxpayer during earlier discussions that the contemplated stock transfer "may have 'certain advantages —both credit-wise and tax-wise'." After the stock sale, the bank continued to require taxpayer's personal guaranty on all operating loans it made, both to Helix and to Kerr Grain.

Following the sale of Kerr Grain stock to Helix, no curtailment of either corporation's activity was undertaken. In fact, following the sale, Kerr Grain expanded its business quite materially while Helix maintained its business on a fairly even keel until 1957 when it, too, expanded its operations.

Neither Helix nor Kerr Grain declared or paid a dividend prior to December 14, 1955. On December 14, 1955, Kerr Grain declared and paid a dividend of $33,500 to Helix. On the same date Helix paid an identical dividend to taxpayer, charging it to an account designated as "Notes Payable to Thomas Kerr." (Taxpayer alleges that the note payable referred to here was not the $50,000 note received by petitioner in exchange for the Kerr Grain Corporation stock, but, as shown by Exhibit 5-E, was one of the notes representing part of the $150,000 loaned to Helix by the bank through taxpayer.)

Kerr Grain also declared a dividend in the amount of $16,500 on June 27, 1956. On the same day the board of directors of Helix passed resolutions providing for the payment of bonuses totalling $13,500 to several of the Helix employees.

No statement or information was submitted on taxpayer's income tax return for the year 1955 with regard to the transfer of the Kerr Grain stock to Helix. (Ex. 1–A.) The Commissioner's determination that the $50,000 of notes received by the taxpayer from Helix was taxable as *dividend income* was sustained by the Tax Court. This appeal followed.

## II—THE LAW
### Relevant sections of the Code.

■ In general, a distribution of property by a corporation to the extent of its earnings and profits is treated as a dividend and is includible in the shareholder's gross income. Sections 316(a) and 301(a) and (c). An exception to this general rule is found in § 302(a) and (b) dealing with distributions in redemption of stock.[3] Under § 302(b) (1) a redemption is not includible in gross income as a

---

3. "§ 302. Distributions in redemption of stock
   "(a) General rule.—If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1) * * * of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.

"(b) Redemptions treated as exchanges.

"(1) Redemptions not equivalent to dividends.—Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend."
(Taxpayer admits that § 302(b) (2–4) is inapplicable. Opening Brief, p. 13.)

dividend if the redemption is "not essentially equivalent to a dividend." Thus, if the redemption qualifies under this exception, the distribution is treated as payment in exchange for stock under § 302(a), and since stock is generally a capital asset, the gain would be treated as a capital gain.

On the other hand, if the redemption does not qualify under this exception of § 302(b), then § 302(d) provides that the redemption shall be treated as a distribution of property to which § 301 applies and be taxed at ordinary income rates. Ordinarily a redemption occurs when a corporation acquires *its* stock from a shareholder in exchange for property. Section 317(b). However, in 1954 Congress added a new provision to the Code, § 304(a) (1),[4] which was designed[5] to expand the provisions of § 115(g) of the 1939 Code (relating to stock redemptions essentially equivalent to dividends) so as to include cases of so-called "brother-sister" corporations. That section provides that, for purposes of § 302, if one or more persons are in control of each of two corporations, and in return for property, one of the corporations acquires stock in the other corporation from the person or persons so in control, then such property shall be treated as a distribution in redemption of the stock of the *acquiring corporation.*

In this case, taxpayer was in control of both corporations, and one of the corporations purchased his stock in the other corporation, so this transaction was covered by § 304(a) (1). Yet, the transaction results in capital gain treatment if the exception of § 302(b) (1) applies. Thus the first basic question is whether this sale of Kerr Grain stock by taxpayer to Helix was "not essentially equivalent to a dividend."

## III—SCOPE OF REVIEW

■ The law on the issue of the scope of review is not as clear as one would desire. Since the inquiry is to a great extent a factual one, most courts of appeal hold that the ultimate decision will be sustained if supported by substantial evidence, or if not clearly erroneous. Cf. Ballenger v. United States, 4 Cir. 1962, 301 F.2d 192, 196 and note 8 (citing cases). Whether *all* courts actually apply that test in practice is probably doubtful. Most opinions do not indicate whether, after the test is enunciated, it is *actually* followed. This court has indicated in Earle v. Woodlaw, 1957, 245 F.2d 119, 122, cert. den. 354 U.S. 942, 77 S.Ct. 1400, 1 L.Ed.2d 1537, that it takes a wider view of the scope of its review of decisions of the Tax Court. This wider view sees determinations as to whether a certain transaction is essentially equivalent to a dividend as a mixed question of law and fact, if not purely a conclusion of law. Of course, all courts agree that the findings of fact of the trial court will be sustained unless clearly erroneous or unless not supported by substantial evidence.

---

4. "§ 304. Redemption through use of related corporations

"(a) Treatment of certain stock purchases.—

"(1) Acquisition by related corporation (other than subsidiary).—For purposes of sections 302 and 303, if—

"(A) one or more persons are in control of each of two corporations, and

"(B) in return for property, one of the corporations acquires stock in the other corporation from the person (or persons) so in control, then (unless paragraph (2) applies) [which it does not here] such property shall be treated as a distribution in redemption of the stock of the corporation acquiring such stock. In any such case, the stock so acquired shall be treat-ed as having been transferred by the person from whom acquired, and as having been received by the corporation acquiring it, as a contribution to the capital of such corporation."

5. S.Rep.No. 1622, 83d Cong., 2d Sess. p. 239 (3 U.S.C.Cong. and Adm.News (1954) 4621, 4876), reads in part: "As in the House bill, the principle of section 115(g) (2) is expanded to include cases of so-called 'brother-sister corporations.' The effect of the operation of section 304 is to characterize as redemptions distributions which are cast in the form of sales. The distributions in redemption shall be examined for taxability subject to the rules of section 302 * * *."

## IV—TESTS TO BE APPLIED

The words "not essentially equivalent to a dividend" are words of art. They are not further defined by Congress. However, in enacting § 302(b) (1), Congress intended that the test for determining whether a redemption was "essentially equivalent to a dividend" should be the same as the test utilized in interpreting and applying the same words in § 115(g) (1) of the 1939 Code S.Rep.No. 1622, 83d Cong., 2d Sess., p. 234 (3 U.S.C. Cong. & Admin. News (1954) 4621, 4870).

What was the test under § 115(g) (1) of the 1939 Code, and what is the test the courts have been using since in applying § 302(b) (1)?

■ The wording of § 302(b) (1) is "not essentially equivalent to a dividend." The question thus in each case "is one of equivalents, and, if that is present, distribution is taxable." Earle v. Woodlaw, supra, 245 F.2d p. 129. Most, if not all the circuits, have considered the "net effect" of the transaction to be the single most important consideration. Within the "net effect" test are two positions. One position, held in the second[6] and third[7] circuits, we describe, for convenience, as a *"strict net effect test."* If the shareholder ends up in the same position he would have if the acquiring corporation had declared and paid a $50,000 dividend, the transaction is, under the strict net effect test, essentially equivalent to a dividend. Under this test, the business purpose, motive and plans of the parties involved are irrelevant. Of course, if the strict net effect test is adopted and applied here, the decision of the Tax Court would be affirmed because the result here is just the same as would have resulted if Helix had declared

a dividend.[8] The second view is the *"flexible* net effect test" which has been adopted by most courts. These have recognized that "most of (the cases arising under Sec. 115(g)) [and under § 302(b) (1)] are of little value in the determination of the question instantly presented, for the reason that each depends for its solution upon its peculiar facts." Earle v. Woodlaw, supra, 245 F.2d at 126 (citing cases). However, under § 115(g) certain "judicial criteria" have been laid down which have proved useful in coming to a conclusion. This court listed and adopted these criteria in Earle v. Woodlaw, supra, 245 F.2d at 126, and in Pacific Vegetable Oil Corporation v. Commissioner, 9 Cir. 1957, 251 F.2d 682, following and citing the leading opinion of Flanagan v. Helvering, 1940, 73 App.D.C. 46, 116 F.2d 937, 939. In the case at bar the Tax Court adequately listed the following criteria as relevant to this case:

"Did the corporation adopt any plan of contraction of its business activities; did the transaction actually result in a contraction of the corporation [sic] business; did the initiative for the corporate distribution come from the corporation or the shareholders; was the proportionate ownership of stock by the shareholders changed; what were the amounts, frequency, and significance of dividends in the past; was there a sufficient accumulation of earned surplus to cover distribution or was it partly from capital; and was there a bona fide corporate business purpose for the distribution?" (38 T.C. at 730.)

The Tax Court found for the Commissioner on each of these criteria. The

6. Northrup v. United States, 2 Cir. 1957, 240 F.2d 304; Radnitz v. United States, S.D.N.Y.1960, 187 F.Supp. 952, affirmed per curiam 294 F.2d 577 (2 Cir. 1961).

7. Kessner v. Commissioner, 248 F.2d 943 (3 Cir. 1957); Boyle v. Commissioner, 187 F.2d 557 (3 Cir. 1951), cert. den. 342 U.S. 817, 72 S.Ct. 31, 96 L.Ed. 618;

Smith v. United States, 121 F.2d 692 (3 Cir. 1941).
   Also see Rives, J., dissenting in Commissioner v. Sullivan, 210 F.2d 607, 612 (5 Cir. 1954), who would apparently adopt this strict test.

8. Taxpayer contends that the strict net effect goes too far, but his arguments are less than convincing.

Court found that prior to the stock transaction Helix had never paid a cash dividend, and that at the time of the transaction, Helix had accumulated earnings and profits available for the payment of dividends. Of course, the proportionate ownership was not changed because taxpayer continued to own all of the Helix stock and, under § 318(a) (2) (C), he continued also to constructively own all of the Kerr Grain stock. The Tax Court found that the business of the two corporations had not contracted but had expanded, although the taxpayer alleges, and the Commissioner concedes (Brief, p. 22), that this criterion is not very significant in the instant situation.

The Tax Court further found that the "initiative for the stock transaction came from petitioner." Taxpayer alleges that this finding has no support in the record. His point seems to rest on the contention that the record shows, and the Commissioner admits (Brief, p. 23, note 12), "that the transaction had its beginning in the advice of business, law and tax advisors, and from the Bank." The Commissioner asserts that since we have here solely owned corporations, any advice can (or perhaps even must) be deemed personal to the taxpayer, and thus the Tax Court's finding is correct. This makes sense. The criterion of "initiative" asks only whether it was the shareholder, or the corporation, which initiated the transaction. It is hard to believe that in a solely owned corporation, initiative can come from the corporation as an entity rather than from the sole shareholder. Any other belief would fly in the face of reality. The finding of the Tax Court on this point seems not clearly erroneous.

Taxpayer places his main reliance in this appeal on his assertion that the transaction "was undertaken to achieve a material and substantial corporate business purpose." Taxpayer claimed below and claims here that the creation of a parent-subsidiary relationship between Helix and Kerr Grain strengthened the credit position of the two corporations, facilitated the free flow of cash between the corporations, and enabled the corporations to conserve cash in taxes through the filing of consolidated returns.

Concerning the strengthening of the credit position of the two companies, the Tax Court pointed out that Helix had been given much credit already by the bank. The Court continued:

"[T]he bank had not requested the stock transfer as a condition precedent to future financing. Furthermore, petitioner offered no evidence that Helix or Kerr Grain were, in fact, unable to obtain adequate financing for their operations from the Portland bank prior to the stock transfer. While the acquisition of Kerr Grain stock may have to some degree ultimately resulted in a strengthening of the credit position of Helix, we have not been persuaded that this was a motivating force for the transfer. Our lack of belief in petitioner's contention becomes even stronger when we observe that after the sale of stock to Helix the Portland bank still required petitioner's personal guaranty on its loans to both companies." (38 T.C. at 731.)

Taxpayer claims that this finding of the Tax Court was clearly erroneous. Taxpayer points out that the two corporations continually were in need of credit, that the general loan officer of the bank testified that a stronger credit position exists in parent-subsidiary than in brother-sister situations; that credit would be also strengthened by the tax savings obtained by filing consolidated returns; that it is sound and prudent business practice to strengthen one's credit position *before* one's credit is otherwise cut off; and that several cases have held that the improvement of credit position defeated a charge of dividend equivalence. Taxpayer cites Jones v. Griffin, 10 Cir. 1954, 216 F.2d 885 *(preferred stock with dividend arrearages* redeemed to obtain bank loan at small interest rate *and for other reasons)*; Bona Allen, Jr., 1940, 51 BTA 260 (corporation's indebtedness to shareholders reduced by partial redemption in order to obtain bank loan at

low interest; *the bank insisted that the indebtedness be reduced)*; and Isaac C. Eberly, 1951, 10 CCH Tax Ct. Mem. 1157, which is in point with similar facts.

In answer to these contentions of the taxpayer, the Commissioner contends that the only advantage a parent-subsidiary relationship has over a brother-sister relationship is that if the parent defaults on a loan, the lender can go against the stock of the subsidiary. The Commissioner points out that in this situation the bank could have obtained more effective security by having the taxpayer pledge the Kerr Grain stock. Taxpayer replies that the pledge device has special problems of foreclosure.

The Commissioner also points out that the strengthening of credit argument can be used in any and every brother-sister redemption, and if successful, could thus "sap Section 304 of its vitality." Taxpayer replies to this that not every corporation has the credit and cash problems that Helix and Kerr Grain had.

■ Considering these opposing allegations and the points made by the trial judge, we cannot conclude that the trial judge erred in finding that the strengthening of credit argument, in itself, was *not* a sufficient corporate business purpose to put the transaction within the exception of § 302(b) (1). This is especially true when one considers the facts that (1) the trial judge was able to observe the bank officer on the stand when he testified; (2) that almost every company needs or could need a stronger credit position; and (3) that at least two circuits have found that the strengthening of credit is not a valid reason for avoiding ordinary income treatment in redemptions. Cf: Bradbury v. Commissioner, 1 Cir. 1962, 298 F.2d 111; United States v. Fewell, 5 Cir. 1958, 255 F.2d 496. Moreover, if Helix was so concerned about its credit, why did it issue notes instead of stock to the taxpayer? The issuance of notes would make its credit standing worse instead of better. A bank would ordinarily prefer the cushion of an additional common stock issue to the issuance of notes by a corporation, with their priority over stock.

As to the taxpayer's argument that the transaction would improve the cash flow between the corporations, the Tax Court said:

"Lastly, aside from his bare assertion, the petitioner has not shown how under the circumstances of this case the transfer of Kerr Grain's stock to Helix facilitated the free flow of cash between the corporations." (38 T.C. at 731–732.)

In reply to this, taxpayer points out that there is evidence in the record, and the Tax Court found, that Kerr Grain paid two dividends to Helix. Taxpayer also points out that when consolidated returns are filed, there is no income tax on the intercorporate dividends, as opposed to the regular fifteen per cent tax of § 243. However, such facilitation of the free flow of cash is always a result of brother-sister redemptions. Many if not all corporations have working capital problems, especially the small, closely held corporations with which § 304 is concerned. One can read the statement of the Tax Court as meaning that even though dividend advantages exist, the taxpayer has not carried his burden of proof of showing that the circumstances of this case are different from other "brother-sister" redemptions. It is thus very doubtful whether the purported business purpose of facilitating cash flow should, in and of itself, take the transaction out of the ordinary income category.

Taxpayer urges a strong point proving a substantial business purpose in emphasizing that the two corporations obtained an immediate tax savings of $31,022.53 in 1956 and $14,499.43 in 1957 by filing consolidated returns rather than separate returns for those years. The Tax Court found:

"Petitioner contends and this Court recognizes that the filing of consolidated returns by affiliated corporations often permits certain tax savings. For this reason, we are of

the opinion that there may have been a *minimal* bona fide business purpose in the stock transfer." (Emphasis added. 38 T.C. at 732.)

The Tax Court added in a footnote:

The petitioner offered *no evidence* as to the amount or significance of the savings that the corporations purportedly hoped to obtain from the filing of consolidated returns. Consequently this Court can only speculate as to the relative materiality of this advantage and in so doing we tend to bear most heavily against petitioner since he carries the burden of proof." (Emphasis added. 38 T.C. at 732, n. 9.)

The Tax Court apparently overlooked these corporate returns in using the words "no evidence."

Taxpayer suggests that this court can take judicial notice of the substantiality of the tax savings obtained by the filing of *consolidated returns. We need not do this*, because the savings are part of the record. Tax savings of $45,521.96 in two years for these two corporations are obviously substantial, compared to the "sale" price of $50,000. The question of substantiality would thus not have to be remanded to the Tax Court for further consideration, were we to hold the tax savings alone a sufficient reason to find a business purpose.

The question is: Did Congress intend that the provisions of §§ 302 and 304 could be avoided any time a corporation with substantial losses acquired a corporation with substantial gains? If so, large loopholes would be created in those sections. Oftentimes taxpayers who own the stock of two or more corporations have loss as well as gain corporations. These taxpayers could obtain cash from these corporations without realizing ordinary income, even though they retained sole control of both corporations, just by selling the stock of one to the other. But even if the loophole only existed in the sale of gain to loss corporations, and then only when the tax savings were substan-

tial, the loophole would still be a large one in the statutory scheme of Congress of §§ 302 and 304.

Furthermore, the savings would not be so substantial in the long run as the figures might indicate because the taxpayer received notes which in face value surpassed the value of these savings in the first two years; almost in one year. If the corporations really needed these savings as badly as the taxpayer alleges, it would not have immediately issued good faith notes. Instead, it would have issued stock. Even though the savings were more immediate than the payment by the corporation on the notes, there is no indication that the two corporations were in dire need of cash. And they apparently could have obtained it from the bank, had they needed it badly. Moreover, the Tax Court in its opinion pointed out that:

"[T]he mere existence of a single bona fide business purpose will not of itself conclusively determine that the transaction does not result in the essential equivalent to a taxable dividend. United States v. Fewell, 255 F.2d 496 (C.A. 5, 1958) [discharge shareholder's debt by redemption to improve credit]; Bradbury v. Commissioner, 298 F.2d 111 (C.A. 1, 1962) [redemption to cancel debt to shareholder to get bank loan], affirming a Memorandum Opinion of this Court; Kessner v. Commissioner, 248 F.2d 943 (C.A. 3, 1957), affirming per curiam 26 T.C. 1046 (1956) [does not really so hold]; Genevra Heman, supra [32 T.C. 479 (1959), affirmed 283 F.2d 227 (8th Cir. 1960)] [two shareholders; one dies and his debt to corporation ended by redemption of his preferred shares]; Neff v. United States, 305 F.2d 455 (Ct.Cl.1962) [redemption of some shares to be resold to raise capital for corporation]." (38 T.C. at 732.)

To the same effect is Ortmayer v. Commissioner, 7 Cir. 1959, 265 F.2d 848, 853. Moreover, after an exhaustive re-

view of the cases, the fourth circuit stated:

> "In the case of a prorata redemption of stock especially, any business justification must be indeed compelling to overcome the 'net effect' test which points to a tax avoidance scheme." Ballenger v. United States, 1962, 301 F.2d 192 at pp. 199–200.

Considering the facts of this case, it does not seem that the purposes which allegedly motivated this transaction are "compelling," nor in the terms of the first circuit in Bradbury v. Commissioner, supra, 298 F.2d at 119, are these purposes "conspicuously countervailing considerations." Furthermore, the words of Judge Learned Hand are relevant to the significance of business purposes:

> "[W]e think that Commissioner v. Estate of Bedford, supra, 325 U.S. 283, 65 S.Ct. 1157 [89 L.Ed. 1611], has authoritatively overruled the doctrine that the distribution of accumulated earnings in the cancellation or redemption of shares can never be 'essentially equivalent' to the payment of a dividend, if the shares were originally issued for a bona fide corporate purpose: i. e. for a purpose other than to evade taxation." Kirschenbaum v. Commissioner of Internal Revenue, 2 Cir. 1946, 155 F.2d 23, 24, cert. den. 329 U.S. 726, 67 S.Ct. 75, 91 L.Ed. 628.

Summing up petitioner's case, of the three purported business purposes, the first two are extremely weak, and the third has its faults. Thus even in aggregate, there is serious doubt whether these are sufficient to constitute a business purpose which would move a court to allow the taxpayer to escape ordinary income treatment here.

Apparently the cases which discuss the business purpose criterion believe that if there exists a substantial business purpose for the transaction, this negates or at least weakens a conclusion that there was an intent to bail out earnings and profits via the redemption of stock.

There are many cases which discuss business purpose, and taxpayer cites nineteen cases for the proposition that:

> "In almost every instance where it was found that the redemption transaction was not essentially equivalent to a dividend, a bona fide business purpose was found to exist." (Opening Brief, p. 24.)

In eighteen of those cases, at least one of the following factors was emphasized by the court: (1) the shares of the taxpayer involved were all redeemed; (2) the redemption was not pro rata; (3) there was a contraction of the corporate business; (4) lenders insisted that the shareholders do something which insistence prompted the redemption; (5) the stock was redeemed to avoid possible friction with other parties; (6) preferred shares with dividend arrearages were redeemed to end the arrearages; (7) shares were redeemed so as to be available for sale to a key employee who demanded some shares; (8) the redeemed shares had been originally issued to cancel a debt and at the time of the issue there was manifested an intention to redeem the shares. (This latter purpose was not considered substantial enough in Ballenger v. United States, supra.) Some of these distinctions obviously are more substantial than others. It is conceivable that some courts might find for the taxpayer on the facts here present. However, the opinions most favorable to taxpayer's position were appellate decisions affirming trial court opinions. This facts alone sheds substantial doubt on the applicability of the eighteen cases to the case at bar when before us on appeal on a question of fact after an adverse decision to taxpayer below. There thus remains substantial doubt whether most of the courts which decided the cited cases would go so far as to allow taxpayer here to escape ordinary income treatment.

One case cited by taxpayer is very similar to the present case and deserves mention. Isaac v. Eberly, 10 CCH Tax Ct. Mem. 1157 (1951) holds that a pro rata redemption of some of the shares of

a corporation to cancel one-half of a shareholder's indebtedness to the corporation was not essentially equivalent to a dividend under § 115(g) of the 1939 Code because credit was the lifeblood of the corporation, the credit standing of the corporation would be improved even though credit was not immediately needed but because prudent business practice dictated planning ahead, and because there was no cash available to pay a dividend. One Tax Court memorandum opinion is not enough in itself to move this court to decide in favor of taxpayer, especially (1) when there is a substantial doubt as to the aid which the transaction here gave to the credit standing of the corporation, and (2) when the transaction increased rather than decreased the indebtedness of the corporation to the shareholder.

It must be remembered that the business purpose of a transaction is *only one* of the criteria to be considered in the weighing process of the flexible net effect test. It must be remembered that the other criteria already discussed weigh against the taxpayer.

The final criterion, *and by far the most important,* is the net effect of the transaction: the result. It is not the "strict" test, because other criteria are considered also, but it is necessary to closely approach the "strict" test because the courts attach by far the most weight to this criterion. In Hirsch v. Commissioner, 9 Cir., 124 F.2d 24, 29, this court stated that the purpose of the transaction to secure favorable interest rates at the bank was irrelevant because "the statute is aimed at the result." In Earle v. Woodlaw, supra, this court stated:

"Some of the earlier cases, emphasizing that a question of fact is involved, also urge that the intent of the directors of the corporation is to be considered. * * * But later cases place the emphasis on the *effect* of the distribution as that which controls, and not the intent nor the

motives, either of the taxpayer or the corporation." 245 F.2d at 129.

Emphasis on net effect is even more important where the corporations are solely owned, as here.

"[S]ince it often happens that the corporation is closely held and the stockholders and corporate officers are the same people, courts following the second approach [flexible] find it almost impossible to untangle the various purposes to say with any assurance that the redemption was justified by a legitimate business purpose. Recourse in such circumstances should be to the factors emphasizing the net effect of the transaction if the statute is to be reasonably applied." Ballenger v. United States supra, 301 F.2d at 198. Accord, Bradbury v. Commissioner, supra.

The Tax Court followed a flexible test, but placed the heaviest emphasis on the net effect of the transaction. The Court said:

"Under the 'net effect' test, all factors are to be considered. * * * After considering all the factors in this case, it is the opinion of this Court that the practical effect of the stock transfer was the same as if Helix had declared and paid a dividend to petitioner." (38 T.C. at 732.)

There can be no question that the result of this transaction is to the taxpayer the same as it would have been if Helix had declared and paid a dividend. Taxpayer received the notes [9] and he still retained 100% of both corporations. As the district court stated in Radnitz v. United States, S.D.N.Y. 1960, 187 F.Supp. 952, affirmed per curiam 294 F.2d 577:

"After the dust has settled, one finds the plaintiffs and their fellow stockholders as firmly ensconced in their tricorporate positions as was true prior to the stock transaction, with admittedly no true diminution of

---

9. Although, as taxpayer points out, notes rather than cash were distributed here, the weight of case law favors treating such notes as cash.

interest or control, despite their transfers of stock." (187 F.Supp. at 958. Quoted with approval in United States v. Collins, 1 Cir. 1962, 300 F. 2d 821 at 824–825.)

Taxpayer alleges that there is a difference between a person's owning the stock of "X" corporation and his owning the stock of "Y" corporation which in turn owns the stock of "X" corporation. That is true, as a factual and technical matter, but the Congress "in its wisdom" has decided that the differences are not as great as the similarities, and thus, under § 318(a) (2) (C), the taxpayer is constructively presumed to own the Kerr Grain stock even though it is actually owned by Helix.[10]

A further contention of taxpayer can be disposed of by a quotation from the district court opinion in Radnitz, supra:

"Plaintiffs urge the court that Congress sought merely to prevent those distributions which reduced corporate assets from escaping dividend equivalence liability; that since Tylon received assets it did not previously own, viz., stock in New Jersey Turner Hall, in return for the cash payments made to plaintiffs and others, no corporate assets of Tylon were depleted. However, to subscribe to these contentions would serve to frustrate the corporate tax policy exemplified by the inclusion of Section 304 in the 1954 Internal Revenue Code and to impute to Congress a limited purpose therein unwarranted by the terms of the Code or its legislative background." Radnitz v. United States, supra 187 F.Supp. at p. 959; quoted with approval in United States v. Collins, supra, 300 F.2d at 824.

In Phelps v. Commissioner, 1 Cir., 1957, 247 F.2d 156, 158, this court, in finding that the taxpayer received a tax-

able dividend, pointed out that although the purported business purpose could have been accomplished other than by a method similar to a dividend, "[t]he net result of the plan adopted, however, was the transfer of accumulated earnings and profits to Phelps and Howell."

In Ballenger v. United States, supra 301 F.2d at 199–200, the court stated in reply to the contention that there were legitimate business reasons for the transaction,

"Nevertheless, these objections could be remedied without at the same time effecting a distribution of corporate earnings at capital gains rates. The taxpayer could as readily have caused the preferred stock to be exchanged for common stock * * *."

■ Where a shareholder picks a "sale" device rather than a "stock for stock" device, an appearance of tax avoidance is given. A taxpayer should not be allowed to avoid the statutory scheme when he could have accomplished all the business purposes he purports to have wished to accomplish, without in effect obtaining a dividend.

We affirm the Tax Court.

## V—CONSTITUTIONALITY

Taxpayer contends that if §§ 304 and 302 are found to be applicable to this transaction such as to tax the taxpayer at ordinary income rates, such application is unconstitutional under Article I, Section 9, Clause 4 of the Federal Constitution which prohibits a direct property tax unless apportioned among the states. Taxpayer claims that this is just a return of the taxpayer's investment, which cannot be taxed as "income" under the Sixteenth Amendment, citing Southern Pacific Co. v. Lowe, 1918, 247 U.S. 330, 38 S.Ct. 540, 62 L.Ed. 1142; Commissioner v. Meyer, 6 Cir. 1943, 139 F.2d 256. Also, Bowers v. Kerbaugh, 1926,

---

10. It is true, as taxpayer contends (Opening Brief, pp. 40–41), that the Commissioner here is thus contending that Helix exists for dividend purposes but not for control purposes. However, this latter contention seems sound because the ownership of Kerr Grain by Helix rather than by taxpayer lacks much in the way of any real or practical consequence. United States v. Collins, 1 Cir. 1962, 300 F.2d 821, 824. Besides, that is what Congress intended to do in § 304.

271 U.S. 170, 46 S.Ct. 449, 70 L.Ed. 886.

The argument that this transaction was just a return of an investment, is difficult to accept. After the transaction, taxpayer still retained control of the Kerr Grain stock, and to all intents and purposes he still owned it, this time its being held indirectly through Helix and not held directly by him. In literal terms he did give up certain rights attendant to direct control of the shares, but realistically he could, through his control of Helix, still deal with Kerr Grain as he pleased. Under these circumstances it is difficult to agree that taxpayer gave up his investment. This transaction looks, as we have decided, much more like a payment of surplus earnings than a return of an investment.

Taxpayer endeavors to equate this transaction with the sale of an asset, such as a warehouse, to Helix. Yet, could not Congress make such a transfer taxable, just as § 304 makes a transfer of certain stock taxable, at ordinary income rates? It seems that Congress could, because the only practical effect of such a sale of a warehouse is that the taxpayer receives cash and he still owns or controls the asset which he purportedly sold.

■ Taxpayer asserts that if the promissory note is but a return of his investment and not a dividend, then tax on it would be unconstitutional. But if it were not a dividend, and hence an investment (contrary to the holding of the Tax Court below), the constitutionality issue would never be and need not be reached. Thus, as the government brief states, nothing is added to the case by the constitutionality argument. Taxpayer replies that his constitutional argument is intentionally misunderstood because "the mere labeling of the distribution as a dividend does not make it so." We agree. But the Tax Court did more! It not only found as a matter of fact and law the distribution was not income, it was a dividend, or the equivalent thereof. This does more than call it a dividend, it makes it the equivalent of one.

■ Further, any court, other than the Supreme Court, should not find unconstitutional a statute (or its equivalent) which has been on the books for many years, except in the clearest of cases. Kronberg v. Hale, 9 Cir. 1950, 180 F.2d 128 at 131, cert. den. 339 U.S. 969, 70 S.Ct. 987, 94 L.Ed. 1377.

■ We hold the provisions attacked are constitutional.

On the petition for review, the decision of the Tax Court for respondent Commissioner of Internal Revenue is Affirmed.