**Eva D. BRADBURY, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 5871.**

United States Court of Appeals
First Circuit.

Heard Nov. 6, 1961.

Decided Jan. 15, 1962.

Raymond S. Oakes, Portland, Me., with whom Oakes & Oakes, Portland, Me., was on brief, for petitioner.

George F. Lynch, Atty., Dept. of Justice, Washington, D. C., with whom Louis F. Oberdorfer, Asst. Atty. Gen., and Lee A. Jackson and A. F. Prescott, Attys., Dept. of Justice, Washington, D. C., were on brief, for respondent.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

HARTIGAN, Circuit Judge.

■ This is a petition for review of a decision of the Tax Court of the United States which entered judgment sustaining a determination by the Commissioner of Internal Revenue of a deficiency in the income tax due from the petitioner for the taxable year 1956 in the amount of $7,518.89.

This case raises the question of whether the cancellation of petitioner's indebtedness to a corporation and an additional credit to her account, upon the redemption of forty-four shares of stock which she held in the corporation were a distribution essentially equivalent to a dividend within the meaning of Section 302(b) (1) of the Internal Revenue Code of 1954, 26 U.S.C.A. § 302(b) (1).

In 1938 the petitioner, Mrs. Eva D. Bradbury organized the L. L. Bradbury Corporation for the purpose of carrying on the lumber manufacturing business which had been formerly conducted by her deceased husband. At incorporation all of the capital stock, which consisted of 300 shares of common stock valued at $100,599.54, was issued to her, except for two qualifying shares which were issued to nominees of petitioner. Commencing in 1947, petitioner transferred shares of this stock to her daughter, Olive Landry, and to her son-in-law, Carl A. Landry. On July 2, 1956, the date on which the instant redemption took place, petitioner held 177 shares, her daughter 86 shares and her son-in-law 25 shares, aggregating the 288 shares of the L. L. Bradbury Corporation then outstanding.[1]

From July 30, 1938 through July, 1956 the Bradbury Corporation continually maintained an "open account" in petitioner's name on its books. Petitioner utilized this drawing account to pay her personal expenses. Whenever petitioner

---

1. On December 31, 1952, and again on December 31, 1953, taxpayer had sold a total of 12 shares to the corporation in exchange for certain real estate and a credit to her account on its books.

was in need of cash, she would make a request of the corporation for the amount she needed. It would be given to her and her account debited. Occasionally petitioner would request the corporation to make direct payments to third persons in her behalf.

From its organization through the year 1956 petitioner was treasurer of the corporation and her account was credited with the amount of her salary. During the taxable years 1945, 1946, 1949 and 1950 through 1952 the Bradbury Corporation declared dividends and credited the amounts of these dividends to petitioner's account. No dividends were declared or paid from the taxable year 1953 to the taxable year 1956, inclusive. From October 1939 until July 2, 1956, petitioner's account showed a continuous debit balance.

On July 2, 1956, petitioner's account indicated that she was indebted to the corporation in the amount of $21,068.94. On that day petitioner transferred 44 shares of her stock to Bradbury Corporation, and the corporation credited her account in the amount of $22,489.28, resulting in a credit balance therein of $1,420.34. Following this transfer, the outstanding stock of the corporation numbered 244 shares, of which taxpayer held 133 shares, Olive Landry 86 shares and Carl A. Landry 25 shares. The 44 shares of petitioner's stock which were redeemed have been held by the corporation as treasury stock. The corporation has continued to actively engage in the lumber business since the transfer.

The facts giving rise to the instant transaction were substantially as follows. Bradbury Corporation was engaged principally in the manufacture of long lumber at its saw mill in York County, Maine. As an adjunct of its main operation it also manufactured box shocks which were made into boxes in a separate building called the "box mill." By 1956 the corporation's saw mill, which

had originally been built in 1917 or 1918, had become so obsolete that the corporation could no longer compete effectively with its competitors. Faced with the alternatives of modernizing its saw mill operations or perhaps being forced out of business, the corporation decided to build a new mill. Having made this decision the officers of the corporation next explored the possibility of obtaining financing to accomplish the construction. In February 1956, petitioner, her daughter and son-in-law approached a certain Mr. Ireland—an official of the Canal National Bank—to discuss whether the bank would finance construction of the corporation's proposed new mill. In the past the corporation had frequently borrowed money from this bank to cover operating expenses in connection with particular consignments of lumber.[2] However, on this occasion, before reaching a decision on whether the bank would lend money in connection with the proposed construction, the bank official requested copies of the corporation's financial statement for the preceding two or three years and also a statement for the current quarter.

In June 1956, in a conference at the bank, petitioner, together with Olive and Carl Landry, were informed that the bank "did not like" the account due from petitioner which as of December 31, 1955 amounted to $20,269.71. The record indicates that Mr. Ireland informed petitioner and the Landrys that the petitioner's account should be "cleaned up some way." The record also shows that the bank official did not indicate specifically how the "cleaning up" should be accomplished.

Thereafter, petitioner, her daughter and son-in-law discussed the matter among themselves and apparently at Mrs. Bradbury's own suggestion, it was decided that she would transfer 44 shares of her stock to the corporation and that her account would be credited with $22,489.28. Once this transfer was accom-

---

2. In February 1956, the bank made a loan of $10,000 to the corporation to be used by it for the purpose of purchasing box lumber. This was a "short-term" loan which was to be repaid over a period of some five or six months as the output of the box mill was sold.

plished a new financial statement was taken to the bank and, in due course, the corporation received a loan from the bank for use in constructing the saw mill. The loan, long term in nature, was approximately $12,000 in amount and called for repayment to be completed in August, 1961.

On her 1956 income tax return, petitioner reported the amount of $22,489.28 as a distribution in full payment in exchange for the redemption of 44 shares of Bradbury Corporation's stock on which she reported a long-term capital gain of $7,734.76. The Commissioner in his notice of deficiency determined that taxpayer received a taxable dividend in the amount of $22,489.28 in July, 1956 upon the redemption of the 44 shares of common stock of the corporation and increased the net income as disclosed by her return by this amount less the amount of $3,867.38 reported by her as the long-term capital gain. The Tax Court sustained the Commissioner's determination and petitioner now seeks a review of the decision of the Tax Court.

The present record poses the vexing question of whether a distribution by a corporation in exchange for a portion of its outstanding stock is to be considered as giving rise to dividend income or capital gain to its stockholders. When a corporation acquires its own stock from a shareholder the event may bear the indicia of a true "sale"—equivalent to an arms length transaction with a third person—or it may in terms of its economic realities more closely resemble the distribution of a dividend. See Bittker, Federal Income Taxation of Corporations and Shareholders (1959), 208–209. Those transactions which more closely resemble sales are accorded capital gains treatment while those partaking of the essential attribute of a dividend—however styled—are taxable at ordinary income rates. Where the shareholder transfers his stock back to the corpora-

tion incident to a corporate distribution to him, the ultimate question is whether the surrender of the shares is an economically meaningful gesture or a sterile exercise in formalism. The mere fact that shares are turned in to the corporation incident to the distribution is a wholly neutral circumstance in assaying the tax incidence of the transaction. Tax wise the transfer will derive its significance and sustenance from the totality of its surrounding circumstances from which it cannot be severed. In sum, if a distribution is in the nature of a dividend it will be so treated. Commissioner of Internal Revenue v. Van Vorst, 59 F.2d 677, 681 (9 Cir., 1932). Needless to say, formal declaration of a dividend is not required. "The principle that substance and not form should control in the application of tax laws * * * is pertinent in this case. Tax laws deal with realities and look at the entire transaction. * * * " Helvering v. Gordon, 87 F.2d 663, 666 (8 Cir., 1937).

In the Internal Revenue Code of 1954 Congress dealt with the question of corporate redemptions[3] in Section 302. Under the statutory scheme, property received in redemption of stock is taxed as capital gain or loss under Section 302(a) if the redemption qualifies as one of four types of transactions set forth in Section 302(b). The four types are: (1) a redemption which "is not essentially equivalent to a dividend;" (2) a distribution which is "substantially disproportionate with respect to the shareholder;" (3) a distribution which is "in complete redemption of all of the stock of the corporation owned by the shareholder;" (4) a distribution in redemption of stock issued by a railroad corporation incident to a reorganization plan under Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205. Thereafter, under Section 302(d) any redemption[4] which fails to qualify under one of the above-cited categories will be treated as a distribution of property un-

3. Under Section 317(b) of the Code, 26 U.S.C.A. § 317(b), a redemption of stock is defined as an acquisition by a corporation of its stock from a shareholder in exchange for property irrespective of whether or not the stock is cancelled, retired or retained as treasury stock.

4. Excluding the partial liquidation sections of § 346, 26 U.S.C.A. § 346.

der Section 301—the codal provision relating to dividends and distributions which exeed corporate earnings.[5]

Here, the petitioner seeks to bring her transaction within the first of the qualifying exceptions of Section 302(b). Her position is that the Bradbury Corporation's redemption of her 44 shares of stock in cancellation of her indebtedness to the corporation, plus a credit to her account was a redemption which was "not essentially equivalent to a dividend."

The Tax Court after analyzing the transaction in the light of its attendant circumstances found the "essential equivalence" which would remove the transaction from the provisions of Section 302(b) (1). In reaching its decision that court applied the "net effect" standard. This "test" was supposedly evolved to foreclose inquiry into the "motives and plans of the shareholders and his corporation and to consider the transaction strictly in terms of its 'net effect.'" Flanagan v. Helvering, 73 App.D.C. 46, 116 F.2d 937, 939-940 (D.C.Cir., 1940). Experience demonstrated that this puristic ideal was not always achieved, see, Bittker, supra, at 210; Keefe v. Cote, 213 F.2d 651 (1 Cir., 1954), and that "net effect" simply came to mean that courts would consider all relevant factors—frequently including the corporative motive —in determining whether a particular transaction was or was not essentially equivalent to a dividend. "The so-called net-effect test is not a weighted formula by which to solve the issue before the court. The net effect of the transaction is not evidence or testimony to be considered; it is an inference to be drawn or a conclusion to be reached. * * * 'Net effect' is a paraphrase for 'essentially equivalent.'" Commissioner of Internal Revenue v. Sullivan, 210 F.2d 607, 609 (5 Cir., 1954).

In the instant case the Tax Court predicated "essential equivalence" on the "net effect" of the following factors. It inferred that the suggestion of the reduction in capital did not stem from an external influence, viz., the bank but from the individual shareholders, and that the corporation's financial condition did not appear to be bettered by the redemption. In effect it rejected the argument of the petitioner that the redemption had been actuated by a legitimate corporate or business purpose. The Tax Court stated: "In the instant case no official of the bank testified. It appears that the bank had given loans to the corporation for purposes of operating the business without requiring that the indebtedness of petitioner to the Bradbury Corp. be cancelled and that the loan for the purpose of building a new mill was not in a substantially larger amount than prior operating loans. The first loan for construction of the new mill was not made until about 18 months after the transaction involved occurred."

Further, the court emphasized the fact that the petitioner was by far the dominant stockholder in the corporation; that the corporation had not adopted a plan or policy of contraction prior to the redemption of petitioner's stock and there was no contraction of the corporate business thereafter. Finally, the court noted that the corporation had—at all relevant times—sufficient earned surplus to cover the distribution.

In this court petitioner challenges generally the Tax Court's determination of essential equivalency and specifically the finding that the redemption was not actuated by a legitimate business purpose. For reasons developed below we believe that the decision of the Tax Court should be affirmed.

■■ Dividends are distributions of earnings and profits to the stockholders which do not change their proportionate interests in the corporation. Pullman, Inc., 8 T.C. 292 (1947). Consequently, as we have stated: "Logically, a redemption of its stock by a corporation is 'es-

5. In the instant case, there was no question but that the corporation had sufficient accumulated earnings and profits from which to make the distribution and that it was made therefrom. In 1955, the corporation's accumulated earnings and profits were $59,913.21 and in 1956 they amounted to $47,400.26.

sentially equivalent to the distribution of a taxable dividend,' * * * whenever the practical result of the transaction is to distribute accumulated earnings essentially *pro rata* among the shareholders while leaving the ownership of the corporation basically the same." Keefe v. Cote, supra, 213 F.2d at 656.[6]

While we recognized in Cote that the courts have not always sought to establish "essential equivalence" with strict logic, nonetheless we believe that the indispensable first step in making this determination is whether the redemption of stock has caused a meaningful change in the position of the shareholder with relation to his corporation and the other shareholders. See, Nolan, The Uncertain Tax Treatment of Stock Redemption: A Legislative Proposal, 65 Harv.L. Rev. 255, 256 (1951). The extent to which the distribution is ratably shared by the stockholders has always been one of the most conspicuous determinants of dividend equivalency. See, e. g., Flanagan v. Helvering, 73 App.D.C. 46, 116 F.2d 937 (D.C.Cir., 1940); Brown v. Commissioner of Internal Revenue, 79 F.2d 73 (3 Cir., 1935); R. W. Creech, 46 B.T.A. 93 (1942). In sum "the most obvious earmarks of a dividend is the pro rata distribution of earnings and profit," Bittker and Redlich, Corporate Liquidations And The Income Tax, 5 Tax Law Review 437, 476 (1950), and must be regarded as the basic criterion of whether a particular distribution more closely equates a sale or a dividend. See, Cohen, Surrey, Tarleau and Warren, A Technical Revision Of The Federal Income Tax Treatment Of Corporate Distributions To Shareholders, 52 Columbia L.Rev. 1, 35 (1952).

It is obvious that where—subsequent to a distribution of property—there has been no real shift in intercorporate interest or no significant change in the economic interest of the parties involved, a proclivity towards dividend equivalence usually results.

Were it not for the attribution rules of constructive ownership which were added to the 1954 Code through Section 318, 26 U.S.C.A. § 318, and made applicable to redemptions under Section 302, the foregoing principles would not produce such a stern impact on petitioner's position. However, under these rules the stock of the Bradbury Corporation which was owned by petitioner's daughter is to be attributed to the petitioner.[7] Once

---

**6.** The test of dividend essential equivalence has been in the Revenue Acts since 1921. See, Bittker, supra, at 209. Section 302 (b) (1) is the direct successor of Section 115(g) of the 1939 Code, 26 U.S. C.A. § 115(g).

**7.** "SEC. 318. CONSTRUCTIVE OWNERSHIP OF STOCK.

"(a) General Rule.—For purposes of those provisions of this subchapter to which the rules contained in this section are expressly made applicable—

"(1) Members of family.—

"(A) In General.—An individual shall be considered as owning the stock owned, directly or indirectly, by or for—

"(i) his spouse * * * and

"(ii) his children, grandchildren, and parents.

*       *       *       *       *

"(2) Partnerships, estates, trusts, and corporations.—

"(A) Partnerships and estates.—Stock owned, directly or indirectly, by or for a partnership or estate shall be considered as being owned proportionately by its partners or beneficiaries. Stock owned, directly or indirectly, by or for a partner or a beneficiary of an estate shall be considered as being owned by the partnership or estate.

*       *       *       *       *

"(4) Constructive ownership as actual ownership.—

"(A) In General.—Except as provided in subparagraph (B), stock constructively owned by a person by reason of the application of paragraph (1), (2), or (3) shall, for purposes of applying paragraph (1), (2), or (3), be treated as actually owned by such person.

"(B) Members of family.—Stock constructively owned by an individual by reason of the application of paragraph (1) shall not be treated as owned by him for purposes of again applying paragraph (1) in order to make another the constructive owner of such stock."

While these attribution rules are generally applicable to § 302(b) (1), see, Thomas G. Lewis, 35 T.C. 71 (1960),

this attribution is applied, prior to the redemption, petitioner must be deemed to have owned a total of 263 shares of the 288 outstanding shares of the Bradbury Corporation, or 91.3 percent of the outstanding stock. The remaining 8.7 percent was owned by petitioner's son-in-law. Immediately after the redemption petitioner owned 219 out of 244 outstanding shares or 89.7 percent. The remaining 10.3 percent was owned by her son-in-law. These figures abundantly demonstrate that despite a transaction which resulted in an economic benefit to petitioner of some $22,489.28, the total effect of the redemption was to effectuate no basic change in the ownership or control of the corporation.

In terms of economic realities the relationship between the shareholders *inter se* and *vis a vis* the corporation remained basically unaltered. Moreover, while the economic increment flowed solely to petitioner and, thus, was not strictly speaking a *pro-rata* distribution, in view of the dominant position of petitioner—owning 91.3 percent of the stock—it was virtually so. As we said in Cote, "although the distribution was not *pro rata,* it was practically or essentially so in view of the very high percentage of the taxpayer's stock holdings." 213 F.2d 651 at 656.

The determination that a distribution in redemption has worked an essentially *pro rata* distribution and produced no material or significant shift in the corporate-shareholder relationship does not, of course, terminate inquiry into whether the transaction which produced these results was or was not essentially equivalent to a dividend. We simply say that in the hierarchy of criteria which may be adduced as evidentiary of this ultimate conclusion these factors must be accorded a preeminent position. And, where they are present, the record must contain conspicuously countervailing con-

siderations to dispel the aura of dividend equivalence which their presence irresistibly impels. We do not find these countervailing considerations present here.

As noted previously, petitioner's principal rebuttal to the determination of dividend equivalence is the assertion that the instant redemption was actuated by a legitimate business purpose. In essence she argues that the generating force behind the transaction was a desire to benefit or assist the corporation as opposed to the purpose of benefiting her as an individual shareholder. She argues that the finding of the Tax Court that the redemption was not prompted by a business purpose was erroneous and that a proper finding in this regard would remove the transaction from the essential equivalence proscription.

We believe that the record justifies petitioner's contention that the transaction was undoubtedly impelled by a legitimate business purpose of the Bradbury Corporation. We believe that the Tax Court placed undue emphasis on the fact that in the past the bank was in the practice of making short term loans to the corporation on specific consignments of lumber despite the presence of the substantial debit balance in the personal account of petitioner. Surely, different considerations might be involved where the bank was asked to grant the corporation a long term construction loan. Consequently, we are entirely willing to believe the petitioner when she says that the fundamental reason behind her transfer of stock was to accord with the stated wishes of the bank that the account be "cleaned up." To be sure the record indicates that petitioner was herself responsible for selecting the specific mode of cleansing which was ultimately settled upon and so in that sense the proximate cause of the transaction stemmed from the shareholder level rather than the corporate level.

their imposition is not inflexible and if it can be demonstrated that discord exists in a family relationship which would make attribution unwarranted, they will not be applied. Compare, Estate of Arthur H. Squier, 35 T.C. 950 (1961) with

Herbert C. Parker, T.C.Memo 1961–176. Here the record is clear that complete harmony and community of purpose existed between petitioner and her daughter and consequently Sec. 318 applies.

However, on this record to concede that the cancellation of the petitioner's indebtedness might be regarded as a corporate business purpose and that it was the efficient cause of the transaction is not to foreclose a finding of "essential equivalence." We believe that United States v. Fewell, 255 F.2d 496 (5 Cir., 1958), where it was held that showing of a business purpose for the redemption, viz., to improve the credit standing of the corporation, does not conclusively prevent a determination of dividend equivalence, establishes the true rule. As the court stated in Fewell: "* * * we are convinced that the mere existence of a single bona fide corporate purpose will not, standing alone, conclusively determine that the transaction does not result in an essential equivalent of the distribution of a taxable dividend." Id. at 500. Cf., Hirsch v. Commissioner of Internal Revenue, 124 F.2d 24 (9 Cir., 1941).

Petitioner places great reliance on our decision in Keefe v. Cote, supra, in contending that a finding of business purpose precludes a determination of dividend equivalence. We believe that this emphasis is misplaced. In that case we upheld a decision based on a general jury verdict for the taxpayer. There the redemption of the stock of a virtual sole stockholder was, by agreement of the parties, submitted to the jury on the basis that the redemption was attempted for the purpose of removing what was deemed to be an adverse reflection on the corporation's credit rating and hence was motivated by a "legitimate business purpose." In our decision, while noting that the "case [was] close" we stated: "* * * the case at bar was submitted to the jury, not only without objection by the Collector but indeed in accordance with his requests to charge, on this broader basis. Considering the case on the basis upon which it was tried, as we think we must, we come to the conclusion that the court below correctly submitted the issue of essential equivalence to the jury, for we think there was evidence upon which the jury could reasonably conclude that there was a 'legitimate business purpose' for the redemption of the taxpayer's shares." 213 F.2d 651 at 657. (Emphasis added). Here, too, we are faced with a close case but, needless to say, the fact that we refused to overturn a verdict for a taxpayer where a jury was allowed to consider business purpose as a justification is not to say that we must reverse a decision of the Tax Court for an asserted failure to grant emphasis to this same factor.

In a proper case, the presence of a legitimate corporate business purpose may well be relevant as an offsetting factor to a determination of dividend equivalence. However, we believe that for business purpose to be of really meaningful import the dichotomy between shareholder and corporation must be more sharply drawn than is the case here. In a case such as the instant one, while, on the verbal level, there may be a conceptually distinct corporate and shareholder purpose, as a matter of economic import, it is unrealistic to attempt to segregate them. The separateness of the shareholders in a widely held corporation or the minority position of a particular shareholder in a closely held corporation make considerations of legitimate corporate business purpose a more eminently vital consideration than here where the shareholder is but the shadow of the corporation. Here in terms of business purpose, the shareholder cannot realistically be divorced from the board of directors. It would, consequently, be unwarranted to turn the presence or absence of dividend equivalence on a distinction where there is really no difference. The record indicates that petitioner as the dominant stockholder of the Bradbury Corporation incurred the $22,000 debit balance with the corporation as a result of withdrawing money to meet her personal expenses. Had she initially redeemed her stock to obtain this money the transaction would undoubtedly be treated as a dividend. The only real distinction between such a case and the instant transaction is that it is now asserted that the bank's request that the in-

debtedness be eliminated furnishes a corporate business purpose. However, in substance there is no material distinction between the two situations; in each the redemption can be ultimately traced to the fact that the stockholder obtained an economic benefit from the corporation in satisfaction of her personal needs.

Consequently, for the foregoing reasons and upon a consideration of the entire record, we believe that the Bradbury Corporation's redemption of petitioner's stock was essentially equivalent to a dividend and taxable as such.

A judgment will be entered affirming the decision of the Tax Court.