**Paul S. MOLONEY**
and
**Dora M. Moloney, Plaintiffs,**
v.
**UNITED STATES of America,
Defendant.**

Civ. No. 67–725.

United States District Court,
N. D. Ohio, E. D.

Jan. 21, 1974.

John Kennedy Lynch, Cleveland, Ohio, for plaintiffs.

Donald D. Weisberger, Asst. U. S. Atty., Cleveland, Ohio, for defendant.

## OPINION

DON J. YOUNG, District Judge:

This is an action by the plaintiffs to recover income taxes which they claim were improperly assessed against them. At the time of trial, the action had been pending for about six years. The taxes involved are for the year 1952. At an earlier stage of the proceeding it was held that the greater part of the plaintiffs' claim was barred by the statute of limitations. The trial was thus concerned with a balance of $15,771.75 out of plaintiffs' original claim of $50,771.-75.

Basically, the evidence reveals that the dispute arises out of the incorporation of part of the plaintiffs' business, which had been operated as a partnership. The plaintiffs had operated a very successful business of manufacturing and selling aluminum combination windows and doors, commencing in 1947. It be-

came international in scope. The bank which was financing their operations, and the European organizations they were dealing with were unhappy about doing business with a partnership consisting of two individuals. In order to satisfy them, a corporation was created in 1950. Aluminum restrictions imposed during the Korean war threatened to destroy the plaintiffs' business, so the corporation was not activated until 1951. As originally set up, the corporation was shown as having capital stock of $50,000, in the form of 100 shares of common stock divided equally between the plaintiffs. In 1952, it was determined that this had been a mistake, as the stated capital of the corporation was $500.00, and it had been intended actually to begin business with a capital of $5000.00. Entries were made in the corporate records and partnership records reflecting the redemption of ninety shares of stock, thus reducing the capital from $50,000.00 to $5000.00.

The corporation, when it was activated in 1951, did not take over the entire business of the partnership. It only took over the manufacturing operations, while the sales operations continued to be the business of the partnership. The manufacturing operations and inventory were taken over by the corporation, which paid for them by the issuance of the stock to the plaintiffs and by creating indebtedness to the partnership for the balance of the value transferred. No stock certificates were ever actually issued and delivered to the plaintiffs at any time.

It is clear beyond the slightest question that these were essentially paper transactions, which satisfied the bank and the European concerns, but left the plaintiffs financially and otherwise exactly where they had always been. It is equally clear that the "redemption" of the ninety shares, to reduce the corporate capital from $50,000.00 to the $5,000.00 it was supposed to have been to begin with, did not change the plaintiffs' financial situation in the slightest. They had no more money or property in-

dividually or as partners, and the corporation had no less money or property, after the "redemption" than before.

Sometime between 1953 and 1955 the tax returns of the plaintiffs and the corporation were audited by the Internal Revenue Service. Agent Vale made the audit, and it was reviewed by Agent Drummond. Some changes were made, increasing the amount of taxes which the plaintiffs were assessed. No claim was made that the "redemption" of the stock was equivalent to a $45,000.-00 taxable dividend to the plaintiffs.

Some years later, another agent of the Internal Revenue Service, a man named Suarez, came to examine the plaintiffs' tax returns for some later years, around 1957. Mr. Suarez was not qualified as an accountant. He was produced as a witness by the Government, but did not establish himself as being entitled to any credibility. He operated strictly upon his personal construction of the Government's manual, which he believed said that all transactions between closely held corporations and their stockholders resulted in taxable income to the latter. Although he denied examining any of the plaintiffs' personal records, or much of anything else, for that matter, except the corporation records, his denial is contradicted by other testimony, and by evidence that he devoted a great deal of time to his examination. Although he asked his superiors for authority to reopen the audit of the 1952 corporate returns, and was denied permission, he nevertheless determined that the "redemption" of the corporate stock resulted in taxable income of $45,000.00 to the plaintiffs in 1952, and assessed them additional taxes upon that amount of money.

Thereafter further proceedings were had, as a result of which the plaintiffs, over a period of time, paid these taxes and others, and then commenced this action to recover the amounts improperly assessed.

Three questions are discussed by the parties:

First, whether the "redemption" so-called of the shares of the corporation was essentially equivalent to a dividend distribution;

Second, whether there was an improper second examination of the taxpayers' books and records for 1952 which would invalidate the deficiencies for that year; and

Third, whether the taxpayers are estopped from maintaining this action.

## I.

As to the first question the evidence leaves no doubt whatever that the transactions with relation to the stock of the incorporated part of the plaintiffs' operations resulted in neither gain nor loss to anybody, either the plaintiffs or the corporation.

The 1939 Internal Revenue Code Section 115, "Distributions by Corporations," sub-paragraph (a) states:

"The term 'dividend' when used in this chapter . . . means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made . . . . ."

Sub-paragraph (g) states:

"Redemption of Stock.—If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the

stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend."

Treasury Regulations 111, promulgated under the Internal Revenue Code, states: (Sec. 29.115–9).

"Distribution in Redemption or Cancellation of Stock Taxable as a Dividend.—If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.

"The question whether a distribution in connection with a cancellation or redemption of stock is essentially equivalent to the distribution of a taxable dividend depends upon the circumstances of each case. A cancellation or redemption by a corporation of a portion of its stock pro rata among all the shareholders will generally be considered as effecting a distribution essentially equivalent to a dividend distribution to the extent of the earnings and profits accumulated after February 28, 1913."

The circumstances of this case make it abundantly clear, except perhaps to Agent Suarez, that the transaction did not distribute any money whatever to the plaintiffs. The Government's arguments attempting to support the indefensible position of the untrustworthy Agent Suarez are ingenious, but not persuasive. A determination based upon the circumstances of a particular case is, of course, purely a question of the facts shown in evidence in the case. The facts here make it clear that except as

paper-work, there was not even a distribution of anything, much less any sort of dividend or payment in cash or in kind, to the plaintiffs. Perhaps the plaintiffs' auditors and attorneys should have been more careful, or used other methods, in their attempts to keep the plaintiff's bank and European suppliers happy, and thus avoided these years of time-consuming and expensive disputes and litigation. It is equally arguable that the Government should have been more careful in selecting its employees, or less stubborn in defending its employee's lack of understanding.

In any event, it is clear that the plaintiffs are entitled to recover those portions of the taxes paid as a result of the improper finding that they received a dividend of $45,000.00 in 1952, to the extent that recovery is not barred by the statute of limitations.

II.

The resolution of the first question essentially renders moot the second question as to whether the deficiency was assessed as the result of an improper audit, and that such an improper audit would invalidate the deficiencies.

The Court has no doubt that whatever the Government now chooses to call the activities of Agent Suarez, or what Agent Suarez claims about his activities, his testimony was too evasive, and too much contradicted by other evidence and the facts of the case, to be accorded any probative force. What in fact he did was to make a new audit which reached a contrary conclusion to that reached by the Agent Vale which was approved by Agent Drummond. It is impossible to see how Agent Suarez could have concluded that the plaintiffs received an additional $45,000.00 of taxable income in 1952 unless he made an audit. He and the Government maintain, in spite of the overwhelming evidence to the contrary, that the plaintiffs did receive this income.

Section 3631 of the Internal Revenue Code provides that,

"No taxpayer shall be subjected to unnecessary examinations and only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Commissioner, after investigation, notifies the taxpayer in writing that an additional inspection is necessary."

It is not pretended that the plaintiffs requested an additional inspection of their records for 1952, or that they received any written notice from the Commissioner that an additional inspection was necessary.

■ The Government, adroitly attempting to carry water on both shoulders, says that since the plaintiffs let Agent Suarez examine their records for 1952, they waived any right to rely upon the provision against a second inspection. In order to waive a protection of the law, there must be a voluntary relinquishment of a known right. In other connections, the courts lay much emphasis on the word "voluntary," and hold that when a government official starts throwing his weight around, merely acceding to his demands is not sufficient to establish the element of voluntariness of the accession.

■ In spite of the protestations of the public relations men for the Internal Revenue Service that it is a kindly and benevolent organization which always leans over backward to make sure that it does not do anything but help the taxpayer be sure that he does not pay a penny more tax than the Government is justly entitled to, such press-agent piffle has little relation to the realities which are patent to those experienced in dealing with the rank and file of this great bureaucracy. When the agents come around, the taxpayer had better cooperate, or he will be made to rue the day. This case itself is an excellent example of this reality. Plaintiffs cannot be held to have waived their right to the protection of § 3631 of the Internal Revenue Code simply because they did not choose to go to the mat with Agent Suarez. His attitude on the witness stand reveals pretty clearly how futile that would have been.

■ The Government also argues that § 3631 does not contain any sanctions for such a violation as occurred here. The Court is not inclined to render the section nugatory because it does not state explicitly that no assessment of deficiency can be made on the basis of an inspection forbidden by the section. Such a result is implicit in the statute. Otherwise it would be completely meaningless. This same conclusion was reached by the Court of Appeals for the Seventh Circuit in Reineman v. United States, 301 F.2d 267 (1962). And see also Application of Leonardo, 208 F. Supp. 124 (N.D.Cal.1962).

If, therefore, it were necessary to determine the issue of a second audit, this Court would have no alternative but to find in favor of the plaintiffs as to this question.

### III.

■ The final question is raised by the Government's claim that the plaintiffs are estopped from maintaining this action because the issue of the stock redemption was before the Appellate Division of the Internal Revenue Service along with a number of other deficiency claims for the years 1952, 1953, 1954 and 1955, and was included in an offer of settlement which was formally accepted.

The Government claims that as a result of this, only the reduced amounts of other claims were assessed and collected, and by lapse of time the Government has lost the opportunity to seek to collect the full amounts of these other claims. Thus, it is claimed that the Government has acted to its detriment

on the plaintiffs' offer, which included assessing the full amount of the stock redemption issue.

Plaintiffs contend that there was not a compromise, but a settlement of a disputed tax. Such settlements are frequently made for various reasons, such as to avoid having interest accrue while the dispute is being litigated. The member of the Internal Revenue Service who handled the settlement testified that in most cases the settlement does not estop the taxpayer from filing a claim for a refund. He did not testify, nor offer any facts which would show, that the settlement with the plaintiffs was one of the type which would estop the taxpayer, or that the settlement was some sort of a compromise.

As a practical matter, the bar of the statute of limitations has effectively deprived plaintiffs of about two-thirds of the amount which they sought to have refunded, so that there is no showing that the Government has actually suffered any detriment by giving up any claims which it may have given up, since it has been able to retain part of the moneys to which plaintiffs are entitled.

The burden of establishing the defense of estoppel is upon the Government. It has failed to sustain it.

### IV.

For all of the foregoing reasons, the Court concludes that the plaintiffs are entitled to recover in this action in the amount of $15,771.75, that portion of their claim for refund which is not barred by the statute of limitations, together with interest thereon from the date of the original payments to the Government.

This opinion will serve as the Court's findings of fact and conclusions of law. Plaintiffs shall prepare and submit an order expressive thereof in accordance with the Local Civil Rules.