Paul S. MOLONEY and Roman Gruber, Executor of the Estate of Dora M. Moloney, Plaintiffs-Appellants,

v.

UNITED STATES of America, Defendant-Appellee (two cases).

Nos. 74–1621, 74–1763.

United States Court of Appeals, Sixth Circuit.

July 23, 1975.

Certiorari Denied Dec. 8, 1975.
See 96 S.Ct. 452.

John Kennedy Lynch, Cleveland, Ohio, for Moloney and Gruber.

Frederick M. Coleman, U. S. Atty., Cleveland, Ohio, Scott P. Crampton, Asst. Atty. Gen., Ernest J. Brown, Richard M. Roberts, Gilbert E. Andrews, Elmer Kelsey, Ann Belanger Durney, Tax Div., Dept. of Justice, Washington, D. C., for U. S.

Before PECK and ENGEL, Circuit Judges, and O'SULLIVAN, Senior Circuit Judge.

ENGEL, Circuit Judge.

This tax refund suit in the district court arises from a deficiency assessed by the government against Paul S. Moloney and Dora M. Moloney[1] in the amount of $50,771.75 in unpaid income taxes for the year 1952. Taxpayers appeal from a partial summary judgment entered in favor of the government in the amount of $35,000.00, and the government appeals from the judgment in favor of taxpayers for the balance.

The deficiency assessment was based upon the government's determination that a reduction in the stated capital of The Moloney Company, a corporation, from $50,000 to $5,000 pursuant to a stock redemption resolution, was essentially equivalent to the distribution of a taxable dividend within the meaning of Section 115(g) of the Internal Revenue Code of 1939, and hence was taxable to

---

1. Dora Moloney died in 1973 and Roman Gruber was substituted for her as co-plaintiff in his capacity as executor of her estate.

the individual taxpayers as ordinary income to the extent of available earnings and profits of the corporation. It is undisputed that, at the time, the taxpayers were the sole owners of the capital stock of the corporation.

A partial summary judgment was entered in favor of the government determining that the taxpayers' right to recover $35,000 of the claim for refund was barred under the provisions of Section 322(b) of the Internal Revenue Code of 1939, because that amount was paid over two years before the claim for refund was filed. The remaining issues were tried on the merits before the district judge sitting without a jury. In an opinion reported at 375 F.Supp. 737 (D.C. Ohio 1974), the court entered judgment awarding taxpayers a refund of the balance of the claim. The trial court ruled in favor of taxpayers on two alternate theories. He first held that there had not, in fact, been any payment passing from the corporation to the taxpayers and that the redemption, if such it was, was essentially a paper transaction which left the taxpayers in no different position from what they had been before. Alternately the trial judge held that the deficiency assessment was made following an improper audit of taxpayers' books in violation of Section 3631 of the Internal Revenue Code, which provides:

"No taxpayer shall be subjected to unnecessary examinations and only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Commissioner, after investigation, notifies the taxpayer in writing that an additional inspection is necessary."

Relying upon *Reineman v. United States,* 301 F.2d 267 (7th Cir. 1962), the trial judge held that the provision banning the examination, while containing no express sanctions for violation, implicitly bans any deficiency assessment which results from the audit.

We reverse and remand for entry of judgment in favor of the government,

holding that the trial court's determination that no benefit passed to the taxpayers is clearly erroneous and that under the circumstances here, Section 3631, Internal Revenue Code of 1939, does not bar imposition of the deficiency. We thus do not reach the question of whether partial summary judgment was properly entered in the government's favor.

The general circumstances of the transaction in question are fairly and accurately reported in the district court opinion as follows:

Basically, the evidence reveals that the dispute arises out of the incorporation of part of the plaintiffs' business, which had been operated as a partnership. The plaintiffs' had operated a very successful business of manufacturing and selling aluminum combination windows and doors, commencing in 1947. It became international in scope. The bank which was financing their operations, and the European organizations they were dealing with were unhappy about doing business with a partnership consisting of two individuals. In order to satisfy them, a corporation was created in 1950. Aluminum restrictions imposed during the Korean war threatened to destroy the plaintiffs' business, so the corporation was not activated until 1951. As originally set up, the corporation was shown as having capital stock of $50,-000, in the form of 100 shares of common stock divided equally between the plaintiffs. In 1952, it was determined that this had been a mistake, as the stated capital of the corporation was $500.00, and it had been intended actually to begin business with a capital of $5000.00. Entries were made in the corporate records and partnership records reflecting the redemption of ninety shares of stock, thus reducing the capital from $50,000.00 to $5000.00. 375 F.Supp. at 738.

While the foregoing facts are fully supported by the record, we find the facts in the paragraph which follows to be clearly erroneous, (F.R.Civ.P. 52):

It is clear beyond the slightest question that these were essentially paper transactions, which satisfied the bank and the European concerns, but left the plaintiffs financially and otherwise exactly where they had always been. It is equally clear that the "redemption" of the ninety shares, to reduce the corporate capital from $50,000.00 to the $5,000.00 it was supposed to have been to begin with, did not change the plaintiffs' financial situation in the slightest. They had no more money or property individually or as partners, and the corporation had no less money or property, after the "redemption" than before. 375 F.Supp. at 738.

As the trial judge found, the corporation was set up with its contribution of capital stock shown to be in the amount of $50,000. While by the time of trial many of the records actually involved were no longer available,[2] it is undisputed that the opening balance sheet of the corporation showed stock capital of $50,000.[3] Also undisputed is that a resolution dated January 15, 1952 was recorded in the minute book of the Corporation providing for the redemption of 90 shares of common stock "at the original

2. Paul Moloney testified that the records were transferred with the sale of the business, and were not returned.

3. According to the corporate records and the corporate income tax return, the opening balance sheet was as follows:

### ASSETS

| | | |
|---|---:|---:|
| Inventories: | | |
| Raw materials | $200,739.93 | |
| Work in process | 863.40 | |
| Supplies | 1,446.24 | $203,047.57 |
| Capital Assets: | | |
| Machinery or equipment | $ 18,151.32 | |
| Trucks | 7,538.03 | |
| Patterns and dies | 3,607.71 | |
| Office furniture and fixtures | 2,468.30 | |
| Small tools | 500.00 | |
| | $ 32,265.36 | |
| Less Reserve for Depreciation | 3,639.51 | $ 28,625.85 |
| Unexpired Insurance | $ 2,998.97 | |
| Utility Deposit | 100.00 | $ 3,098.97 |
| Total Assets | | $234,772.39 |

### LIABILITIES

| | |
|---|---:|
| Current Liabilities: | |
| Accounts Payable—Paul S. and Dora M. Moloney, d/b/a The Moloney Company | $184,772.39 |

### CAPITAL

| | |
|---|---:|
| Capital Stock—common without par value | |
| Authorized 250 | |
| Issued 100 | |
| Stated value | $ 50,000.00 |
| Total Liabilities and Capital | $234,772.39 |

issue price of Five Hundred Dollars ($500.00) per share".[4] The closing balance sheet for the year 1952[5] showed capital stock of $5,000.00. The record fails to reveal any amendments to the balance sheets or to the resolution.

From the balance sheets, it can thus be seen that the corporation's stock capital was reduced from $50,000 to $5,000 during the taxable year. If there was in fact no redemption of $45,000 in capital stock, where did that money go?

4. The resolution adopted provided:

"WHEREAS, The Moloney Company has a substantial surplus of assets over liabilities and capital, and
WHEREAS, the present and anticipated future operation of the corporation does not require a maintenance of the substantial capitalization presently existing,

BE IT, THEREFORE, RESOLVED that The Moloney Company purchase and retire proratably from present shareholders ninety (90) shares of its issued and outstanding no par common stock at the original issue price of Five Hundred Dollars ($500.00) per share, and that the Directors be instructed to negotiate, arrange and carry out such purchase."

5. According to the corporate income tax return, the closing balance sheet for the year 1952 was as follows:

### ASSETS

| | | |
|---|---:|---:|
| Cash | | $ 5,951.77 |
| Notes and accounts receivable | $136,199.80 | |
| Less: Reserve for bad debts | -0- | 136,199.80 |
| Inventories: | | |
| Raw materials | 58,421.75 | |
| Work in process | 426.50 | |
| Finished goods | 3,231.00 | |
| Supplies | 1,463.70 | 63,542.95 |
| Capital Assets: | | |
| Depreciable assets: | | |
| Small tools | 500.00 | |
| Per schedule for Schedule I | 46,903.35 | |
| Total depreciable assets | 47,403.35 | |
| Less: Reserve for depreciation | 9,316.03 | 38,087.32 |
| Other assets (itemize) | | |
| Prepaid and deferred expenses | 85.77 | |
| Unexpired insurance | 5,504.09 | |
| Utility deposit | 100.00 | |
| Leasehold improvements, net | 6,475.98 | 12,165.84 |
| Total Assets | | $255,947.68 |

### LIABILITIES

| | | |
|---|---:|---:|
| Current Liabilities: | | |
| Accrued expenses: | | |
| Rent | 3,500.00 | |
| Salaries and wages | 4,691.85 | |
| Hospitalization | 97.31 | |
| Property taxes | 1,007.75 | |
| Payroll taxes & insurance | 1,673.28 | |
| Federal taxes on income | 130,000.00 | $140,970.19 |

### CAPITAL

| | | |
|---|---:|---:|
| Capital stock—common without par value | | |
| Authorized 250 | | |
| Stated value | 5,000.00 | |
| Earned surplus and undivided profits | 109,977.49 | 114,977.49 |
| Total Liabilities and Capital | | $255,947.68 |

It was claimed on behalf of the taxpayers that the $45,000 in effect never existed in the first place, and that when the corporation was activated, the taxpayers' accountants and attorneys mistakenly and without authority set the capital stock account up at $50,000 instead of an intended $5,000. Thus, it is claimed, while the correction was treated in form as a redemption, it was in fact no more than the correction of a clerical error which should never have occurred in the first place. Any proof of such an assertion must rest solely upon the parol testimony of a subjective intent on the part of the taxpayers which is claimed to have existed at the time the corporation was activated, for no such intention whatever appears in any of the books and records of the corporation, or in any of its tax returns.

We are, of course, bound to view the evidence in the light most favorable to the taxpayers here. Even on such basis, however, their case cannot be made out. As did the trial judge, we credit the testimony of Paul Moloney. However, at best his testimony only shows a complete and admitted lack of understanding of the issues in the case and of the claim of mistake which was advanced on his behalf to support the refund. Moloney's concept of what happened is ambiguous. He appears first to believe that the $50,000 reported as the value of a capital stock in the opening balance sheet reflected a cash contribution which he never in fact made.[6] As the opening balance sheet itself shows, however, the corporation started business with no cash at all. The entire assets of $243,772.39 were in the form of inventories, capital assets such as machinery, trucks and the like, and values attributable to unexpired insurance and utility deposits. At no time has it ever been claimed that the assets as reported in the balance sheet were either improperly or inaccurately listed, or that the book values attributed to them were not correct.

Alternately Paul Moloney appears to have believed that the $50,000 reported as the value of common stock was actually, though mistakenly, paid in cash by him and subsequently, through adjustment of accounts, was merely returned because that payment was in error.[7]

**6.** Q So you organized the corporation in 1950. Do you recall what the capital investment was on the part of your wife and yourself?

A In the corporation?

Q Yes.

A Well, we were capitalized for $500 in the corporation, and subsequently there was $50,000 put into the corporation. And I think that—while I don't believe there was any stock issued, I believe we got a hundred shares of stock.

Q Now, was that $50,000 actually paid in for the stock?

A Not a penny.

Q Now, I will draw your attention to the 1952 fiscal year corporation return. Do you recall the balance sheet on that return? I will point out to you line 14–B.

Do you recall why that $50,000 stock, common stock, figure at the beginning of the fiscal year was changed to 5,000 at the end of the fiscal year?

A My recollection is it was never intended to be 50,000 in the first place. It was intended to be 5,000.

Now, I am not sure, we are going back 24, 25 years, but perhaps I as a salesman and going over to Germany—which I did do. I went over there, I bought $750,000 worth of merchandise from the Germans over there. Perhaps in my salesmanship, in my dealings, that I got $50,000 mixed up some way, you know, instead of five. But I do know that we didn't have—we didn't have $50,000.

**7.** Q Do you remember any Board of Directors meetings with respect to setting up the corporation where the stated capital was discussed?

A No, I don't. See, the Board of Directors, I believe, would have consisted of my wife, myself, Rusk Haverfield, and Harry Valley.

Q Was there an agreement between the partnership and the corporation with respect to the transfer of assets, a written agreement?

A A written agreement, no.

Q Now, outside of the testimony that you heard today from Mr. Valley, did you know personally what was the adjustment to reduce the capital account?

A At the time the adjustment was made?

Q Yes. Did you know what accounts, what offsetting adjustments were made?

A Well, yes, I knew what offsetting adjustments. When I found out that we had taken money from the partnership into the corporation, which was never intended to be taken, it was a question of reversing. Certainly I knew that, that it was being reversed.

Moloney neither made a cash contribution mistakenly or otherwise, nor was such a contribution in cash ever reflected on the books of the corporation. He did, however, get $45,000 back, albeit not in cash.

The answer to how the $45,000 got out of the corporation and back into the personal assets of the individual taxpayers lies in the testimony of Moloney's own witnesses and in understanding the profitable operations of The Moloney Corporation which occurred during its first year of business. As reported on the corporation income tax return, The Moloney Corporation, during its first full year of business reported a net income before taxes of $242,656.62. The corporation reported an earned surplus and undivided profits at the close of the taxable year in the amount of $109,977.49.

A reduction on the balance sheets of the capital stock of a corporation cannot take place without corresponding adjustments being made elsewhere. So much was admitted by Harry R. Valley, C.P.A., who was the accountant for Moloney during this period and who testified on his behalf at the trial. Obviously that adjustment had to have been made between January 15, 1952, the date of the resolution, and January 31, 1952, the close of the corporation's taxable year when the change appeared. Upon the undisputed proofs, that adjustment was accomplished by a reduction in an "Inter-Company Account" which existed between The Moloney Corporation and the Moloney partnership, and, on the balance sheet, by a comparable reduction in the reported accounts receivable.

As correctly found by the trial judge, the sales operations of The Moloney Corporation continued to be operated as a partnership after all of the manufacturing operations were transferred to the corporation. Thus, as reported by Paul Moloney:

> "The partnership bought this merchandise from the manufacturing company at X dollars and resold it for X dollars and the partnership existed upon the difference between the X dollars." Supp.App. 33.

These continuing transactions were shown in the "Inter-Company Account" which reflected from time to time the amounts which Paul and Dora Moloney, as partners in the sale partnership, owed to the corporation for purchasers of its merchandise.

The reduction upon the books of the corporation in the stated value of capital stock contribution was accomplished by crediting to the account of the partnership the sum of $45,000, which it owed for merchandise purchased, thus relieving it and its only partners, the taxpayers, of a legal obligation to repay the corporation that amount. This is acknowledged by Moloney's accountant, Valley,[8] and Moloney himself appears at least to have had some vague understanding of the nature of the transaction.

■ In our judgment, the foregoing undisputed evidence establishes as a matter of law that there was a distribution in the amount of $45,000 to the taxpayers. We further conclude that such a

---

8. Now, when reversing the alleged error one would debit the capital account by 45,000, isn't that correct?

 A That's right.

 Q And they would credit the inter company account?

 A That's right.

 Q And in crediting the inter company account what would they actually do? What does that mean when we credit an accounts receivable?

 A In this particular case, just looking at the balance sheet that is lying before me, the chances are that the account receivable from the—well, the account receivable from the partnership would have been reduced.

 Q And that means that the partnership would owe less money to the corporation?

 A That's right. Supp.App. pp. 187–188

redemption was essentially equivalent to a taxable dividend within the meaning of Section 115(g) of the 1939 Code. *Bradbury v. C.I.R.,* 298 F.2d 111 (1st Cir. 1961); *United States v. Davis,* 397 U.S. 301, 90 S.Ct. 1041, 25 L.Ed.2d 323 (1970). The taxpayers were the only shareholders in the corporation. They were also sole members of the partnership. Thus, they were in total control of both. The redemption was not only pro rata between them, but was in an amount less than the available earnings and profits of the corporation for that year.

The evidence here shows that the corporation cancelled $45,000 of the debt owed to it by the partnership in consideration for the retirement of 90 shares of stock. The benefit the partnership received from the cancellation of the debt was a direct benefit to the taxpayers in their individual capacities. Cancellation of a valid debt is, of course, valuable consideration and can result in tax consequences as do many non-cash transactions. See *Bradbury v. C.I.R., supra.*

It is provided in the Treasury Regulations to the 1939 Code:

> "A cancellation or redemption by a corporation of a portion of stock pro rata among all the shareholders will generally be considered as affecting a distribution essentially equivalent to a dividend distribution to the extent of earnings and profits accumulated after February 13, 1913." Section 39.-115(g)–1.(2)

Thus, there is created a presumption of dividend equivalence where it is shown, as here, that value had been transferred from the corporation to the individual taxpayers and where there were ample earnings and profits accumulated from which such benefit could be paid. The regulation further provides that:

> "The question whether a distribution in connection with a cancellation or redemption of stock is essentially equivalent to the distribution of a taxable dividend depends upon the circumstances of each case." Section 39.-115(g)–1.(2)

In evaluating the circumstances of each case to determine whether dividend equivalence exists, courts have looked to "the net effect of the distribution rather than the motives and plans of the taxpayer or his corporation". *Smith v. United States,* 121 F.2d 692, 696 (3rd Cir. 1941). See also *Keefe v. Cote,* 213 F.2d 651 (1st Cir. 1954). While the motives of the taxpayer may not always be irrelevant in determining "net effect", Cf. *Bradbury v. C.I.R., supra,* they do not control. Where the net effect of the distribution is, as here, to move the equivalent of cash and undivided surplus profits out of the corporation to the taxpayers, who continue as sole owners of the corporation, we believe it is immaterial that it may have been prompted by a subjective motive to correct a claimed error in the amount of stated capital which was originally intended to be contributed. This is particularly so where such a motive is not expressed upon the corporation books and where, in fact, it appears that if such was initially an error, it was knowingly suffered to exist throughout the entire taxable year after discovery, because its effect was considered beneficial to the interests of the corporation. In this respect, Harry R. Valley testified:

> "I know that we explained—or I am quite sure I explained that one of the basic reasons for leaving this initial opening balance sheet stand the way it was instead of attempting to correct it had been that a number of financial statements had been issued to banks and to creditors and if we had gone back, if the accountants had gone back and insisted that the client correct his records on a retroactive basis, we would have put him into an embarrassing situation with his creditors because there were financial statements out that indicated this earlier value." Supp.App. 168–169.

In *Bradbury v. C.I.R., supra,* it was shown that the taxpayer, as the sole owner of Bradbury Corporation, had been in the practice periodically of drawing from company funds for her personal

expenses. Debits to her account were made after each withdrawal to the point where finally that account showed a debt to the corporation of over $20,000. To cancel the debt, the taxpayer thereupon transferred 44 shares of her stock back to the corporation and her account was credited in the amount of $22,489.28. The First Circuit, noting that there may have been a business purpose for the transfer, nevertheless decided this motive did not defeat a finding of dividend equivalence:

> "It is obvious that where—subsequent to a distribution of property—there has been no real shift in intercorporate interest or no significant change in the economic interest of the parties involved, a proclivity towards dividend equivalence usually results." *Bradbury v. C.I.R., supra,* at 116, quoting Cohen, Surrey, Tarleau and Warren, A Technical Revision of the Federal Income Tax Treatment of Corporate Distributions to Shareholders, 52 Columbia L.Rev. 1, 35 (1952)

Taxpayer in *Bradbury,* therefore, was thus required to pay tax on the full amount that her account was credited by the transfer back of the shares.

An even stronger statement is found in *United States v. Davis,* 397 U.S. 301, 90 S.Ct. 1041, 25 L.Ed.2d 323 (1970) in which the Supreme Court held that where the sole shareholder of a corporation causes part of his shares to be redeemed by his corporation, "such a redemption is always 'essentially equivalent to a dividend' within the meaning of that phrase in Section 302(b)(1)",[9] 397 U.S. at 307, 90 S.Ct. at 1045. The Court further found that in such circumstances, the business purpose of a transaction is irrelevant in determining whether the redemption was equivalent to a dividend.

In sum, taxpayers here received value in the amount of $45,000 upon the redemption of their shares. The redemption did not change their ownership interests in The Moloney Corporation; they retained complete control both before and after the transaction. While there may have been a business purpose for the redemption, the net effect of the distribution was nonetheless a dividend. *Davis, supra.* Accordingly, we hold that the government properly treated the cancellation of the debt as the equivalent of a dividend in the amount of $45,000, and that therefore such amount was subject to taxation as ordinary income.

As an alternative to his holding that there had been no taxable distribution to the taxpayers, the district judge held that in any event the deficiency assessment was the product of an unauthorized additional inspection of the taxpayers' books of account which was made contrary to the provisions of Section 3631 of the Internal Revenue Code of 1939, quoted earlier. The trial judge noted that Section 3631 does not contain any sanctions for its violation. Nevertheless, the Court held:

> "The court is not inclined to render the section nugatory because it does not state explicitly that no assessment of deficiency can be made on the basis of an inspection forbidden by the section. Such a result is implicit in the statute. Otherwise it would be completely meaningless. This same conclusion was reached by the Court of Appeals for the Seventh Circuit in *Reineman v. United States,* 301 F.2d 267 (7th Cir. 1962). See also *Application of Leonardo,* 208 F.Supp. 124 (N.D.Cal. 1962).

> "If, therefore, it were necessary to determine the issue of a second audit, this Court would have no alternative but to find in favor of the plaintiffs as to this question." 375 F.Supp. at 741

Although vigorously contradicted by the government, the district judge held that an unauthorized inspection of the taxpayers' books was made for the year 1952. The judge chose also to disbelieve altogether the testimony of the government agent who conducted the second audit. In deference to the trial judge's superior ability to evaluate the credibility of witnesses, we have also disregarded this testimony entirely. Thus viewed,

---

**9.** Section 302(b) of the 1954 I.R.C. is the counterpart to Section 115(g) of the 1939 Code.

the evidence supports a finding that the agent actually examined at least the corporate records and the partnership records for 1952.

 Although the cited provisions of Section 3631 have been in effect in one form or another for many years, there has been very little judicial construction of the section and none whatever in this circuit.[10] The question is to what extent a violation of the section excuses the obligation to pay the deficiency which would otherwise exist. Since the statute itself is silent, this extreme result is warranted only if it is necessary to enforce the statutory provision. This, in turn, depends upon whether a contrary result, in the words of the district judge, would render the provision "completely meaningless".

In *Reineman, supra,* the Seventh Circuit set aside a deficiency assessment against the taxpayer where the evidence before the district court sustained the taxpayer's claim that it was the result of a second inspection of the taxpayer's books of account, affected without written notice to the taxpayers as required by Section 7605(b) of the Internal Revenue Code of 1954 (the counterpart of § 3631). In so doing, the Seventh Circuit took particular note that the second and unauthorized examination of the books occurred without any request therefor by the taxpayers and in fact without their knowledge of its having taken place until after it was completed. Particularly because of this latter circumstance, the court in *Reineman* rejected the government's contention that the remedy for a violation of Section 7605(b) is "one of self-help—he may refuse to permit the subsequent examination and oppose the director's application for a subpoena". The court observed that:

"The short answer to this is that the taxpayers had no opportunity for self-help. Agent Rogers never made any pretense that his assignment was to reopen the year 1954 or to reaudit the books of account for that year. . .

Taxpayer was totally unaware of any re-examination, while it was in progress." 301 F.2d at 271

The Seventh Circuit recognized those cases which held generally that re-inspection is not a bar to the assessment where the taxpayer fails to object, or voluntarily consents. See *Philip Mangone Co. v. United States,* Ct.Cl., 54 F.2d 168 (1931); *Executors of Estate of Barker v. Commissioner,* 13 B.T.A. 562 (1928); *McDonnell v. Commissioner,* 6 B.T.A. 685 (1927). See also *Field Enterprises, Inc. v. United States,* 348 F.2d 485, 172 Ct.Cl. 77 (1965). *Reineman* concluded, however, that

"Under the facts of this case, taxpayers are left without any remedy to correct the illegal action taken by the Commissioner unless the deficiency assessment is set aside. We hold that the district court did not err in its conclusion of law to that effect." *Reineman, supra,* at p. 272

From the foregoing language, it is apparent that *Reineman* was never intended to create an automatic rule invalidating the deficiency every time there is a violation of the inspection statute. Moreover, we cannot agree with the district judge that this result must invariably follow because a contrary rule would make that section nugatory. On the contrary, while we would be reluctant indeed to hold that no circumstance may exist in which such radical remedy for violation might be appropriate, the circumstances must satisfy us that such a remedy is both justified and necessary under the circumstances as a deterrent. Whatever those circumstances may be, we do not find them here. We agree with the view of the Court of Claims that "not every infraction of the notice requirement calls for nullification of the deficiency assessment." *Field Enterprises, Inc. v. United States, supra,* 348 F.2d at 491.

Upon disputed evidence, we accept the taxpayers' contention that the agent did, in fact, inspect their personal records.

---

10. For a discussion of the general legislative intent concerning the provisions, however, see

*United States v. Powell,* 379 U.S. 48, 55, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964).

Since the partnership itself was not a taxable entity but merely an extension of the persons of the taxpayers themselves, partnership records were necessarily personal records and entitled to the statutory protection in the absence of a notice reopening the inspection. Cf. *United States v. Slutsky,* 487 F.2d 832, 845 (2nd Cir. 1973). See also *Application of Leonardo, supra.* At the same time, the protection of the section does not extend to an examination of the corporate records, since the corporation is not the "taxpayer" involved here. *Hinchcliff v. Clarke,* 371 F.2d 697 (6th Cir. 1967). It is the unauthorized invasion of the taxpayers' own books and consequently his personal privacy, which is the target of the section.

We conclude the taxpayers are entitled to the protection of the section as to their partnership as well as strictly personal records, and that the evidence supports a finding that Section 3631 was violated as to those protected records. We also conclude, however, contrary to the view of the trial judge, that the deficiency assessment was for the most part based upon information learned from the non-protected corporate records of the company. Indeed, the balance sheets, the resolution, and the tax return all relied upon by the government to establish the basis for the dividend equivalence, were not taken from either the partnership or the personal records of the taxpayers. We thus find that while the privacy of the taxpayers was invaded, this invasion was not the motivating cause of the deficiency assessment. In our view, invalidation of the assessment under these circumstances would be inappropriate.

Further, while taxpayers here may not have given their consent to the second examination, there is no doubt that Paul Moloney unlike *Reineman, supra,* was aware of the examination at the time it took place. Indeed, the evidence in support of the finding that the examination occurred stems in large part from the testimony of Moloney that he knew it was going on while it was being conducted.

We hold, therefore, that taxpayers' proper recourse for violation of Section 3631 was, in this instance, to object to and challenge the unauthorized inspection at the time it was made. Under these circumstances, we decline to nullify what we have found to be an otherwise valid assessment of a tax deficiency.

As noted earlier, we do not pass on the question of the propriety of the partial summary judgment in favor of the government. Such a decision is rendered unnecessary by our conclusion that final judgment on the merits should be entered in favor of the government.

The judgment of the district court is reversed and the case is remanded for entry of a judgment in favor of the United States.